STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-45

ULETOM HEWITT

VERSUS

LAFAYETTE CITY-PARISH
CONSOLIDATED GOVERNMENT AND
LAFAYETTE MUNICIPAL FIRE AND
POLICE CIVIL SERVICE BOARD

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, DOCKET NO. 20153790
HONORABLE MICHELLE M. BREAUX, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Sylvia R. Cooks, Shannon J. Gremillion and Van H. Kyzar, Judges.

Cooks, Judge, dissents and assigns reasons.

AFFIRMED.

**C. Theodore Alpaugh, III**
**Guste, Barnett, Schlesinger, Henderson**
**& Alpaugh, L.L.P.**
**639 Loyola Avenue, Suite 2500**
**New Orleans, LA  70113-7103**
**(504) 529-4141**
**ATTORNEY FOR APPELLANT:**
  **Uletom Hewitt**


**Michael P. Corry, Sr.**
**J. Daniel Siefker, Jr.**
**Briney Foret Corry, LLP**
**P.O. Drawer 51367**
**Lafayette, LA 70505-1367**
**(337) 237-4070**
**ATTORNEYS FOR APPELLEE:**
  **Lafayette City-Parish Consolidated Government**

**GREMILLION, Judge.**

Uletom Hewitt appeals the trial court's appellate review of the Lafayette Municipal Fire and Police Civil Service Board's (the Board) decision upholding his termination from employment as a police officer. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

Hewitt worked as a police officer for the Lafayette Police Department (LPD) from 2006 to August 30, 2011. He received his BA degree in criminal justice from the University of Louisiana at Monroe in 2000. Before joining LPD, Hewitt worked as a police officer for the Grambling Police Department for roughly one year and as a deputy for the Ouachita Parish Sheriff's Office for approximately five years. For the six years prior to that, Hewitt worked for the Lincoln Parish Detention Center and Richwood Correctional Center. Hewitt's supervisors, superior officers, and LPD Chief Jim Craft praised Hewitt on many occasions.

On December 21, 2010, while working off-duty security detail at Dillard's, Hewitt believed he saw evidence of a bomb in the Mall of Acadiana food court and took steps to evacuate the mall's patrons. Hewitt was ultimately disciplined by LPD for his over-exuberant handling of the matter and for disobeying an order from one of his superiors to not evacuate the mall. On March 3, 2011, Hewitt was suspended for five days without pay based on the finding at a pre-determination hearing "that Mr. Hewitt disobeyed a direct order from a superior officer, Sergeant Starring, which caused panic and chaos, which unnecessarily alarmed the public." *Hewitt v. City of Lafayette*, 15-912, p. 3 (La.App. 3 Cir. 3/2/16), 186 So.3d 357, 359. Hewitt appealed the determination to the Board. On January 14, 2015, the Board upheld the decision and punishment, as did the Fifteenth Judicial District Court and this court. *Id.*

On March 2, 2011, Hewitt was accused of failing to properly use the in-dash camera system in his police cruiser. A pre-determination hearing was held on this complaint, and on August 8, 2011, Hewitt was suspended for seven days without pay. Hewitt appealed his suspension to the Board, which refused to hear the appeal on the basis that Hewitt's suit pending in federal court precluded it from hearing Hewitt's appeal. In *Hewitt v. Lafayette Municipal Fire & Police Civil Service Board*, 13-1429 (La.App. 3 Cir. 6/4/14), 139 So.3d 1213, this court found that the Board's refusal to hear Hewitt's appeal was arbitrary and capricious and without legal cause. The case was remanded to the district court, which was ordered to issue a writ of mandamus compelling the Board to hear Hewitt's appeal.

Hearings on Hewitt's appeal to the Board were held on January 14, 2015, eight months after this court's ruling, at which time the Board upheld the suspension. Hewitt appealed to the district court and it upheld the Board's decision. This court affirmed the trial court's ruling. *Hewitt v. Lafayette Mun. Fire & Police Civil Serv. Bd.*, 15-835 (La.App. 3 Cir. 3/2/16), 186 So.3d 339, *writ denied*, 16-619 (La. 5/27/16), 192 So.3d 736.

On March 25, 2011, Hewitt was placed on paid administrative leave pending a fit-for-duty examination. According to Hewitt, he informed Dillard's that day that he had been placed on administrative leave and was thus ineligible to work off-duty detail. According to Hewitt's testimony and written statements in the record, Dillard's did not want to lose Hewitt as an employee, but under their employment policy they could not keep his position open for an indeterminate length of time. As Hewitt could not say how long his administrative leave would last, Dillard's had no choice but to terminate his employment. Further, according to Hewitt, Dillard's invited him to apply for his job after the administrative leave was over. LPD, on the other hand, introduced documents at the hearing that

2

indicated Dillard's fired Hewitt for leaving the premises while fraudulently still being registered on the time clock as working. Further, Dillards' asserted that on at least six occasions during which he left while still clocked in, Hewitt had paused at the time clock to appear to clock out.

According to Hewitt, when he arrived for his shift duty at LPD on March 25, 2011, he was told that he was placed on administrative leave effective immediately and that he would be informed later as to the reason therefor. He was required to surrender his weapon, Taser, and summons book. He was not allowed to go to his police unit, which was secured at LPD headquarters. He was instructed not to call, email, text, or in any manner contact the LPD, or anyone at LPD, until further notice. When he indicated that he was leaving to walk home, the officers said they would give him a ride home. He initially refused their offer and said he would rather just walk. The officers in charge expressed their concern that it would not look good for a uniformed police officer to be seen walking home. Hewitt acquiesced.

Dr. Thomas G. Latour, M.D., a psychiatrist, was asked to evaluate Hewitt. Lafayette City/Parish Nurse, Kim Bare, the person in charge of referrals for such evaluations, normally referred employees to Dr. Latour. Upon completing the evaluation, Dr. Latour wrote, "I feel he is fit for duty." On the same form, Dr. Latour wrote the following:

> MENTAL HEALTH EXAMINATION: The patient is a casually groomed black male who appears to be in no acute distress. He relates well to the interviewer. His mood is one of depression and his affect is blunted. His speech is normal. He is oriented as to time, person, place and situation. His thought processes are intact without any looseness of associations. He denies having hallucinations. He is neither paranoid nor delusional. His memory is intact for recent and remote events. His intellectual functioning is considered to be fair and he has a good general fund of knowledge. . . ."

3

The last sentence in Dr. Latour's report stated, "His judgment and insight are considered to be poor." This comment was marked through by hand, probably by Dr. Latour. An arrow was drawn from the scratched-through comment to the bottom of the page, and a handwritten note stated, "I do not agree with this statement." Dr. Latour then apparently signed his name after the handwritten notation. The marks on the document may indicate that Dr. Latour did not agree with the assessment that Hewitt had poor judgment and insight, but it certainly raised the question of why he signed the form in the first place with the notation that Hewitt's judgment and insight are poor.

Chief Craft decided that the scratch-out and the handwritten comment left him unable to rely upon Dr. Latour's assessment, so he ordered Hewitt to submit to another assessment by a firm in Baton Rouge, Matrix, Inc.

Hewitt was transported to Baton Rouge on June 21, 2011, in a police unit, accompanied by two officers, to the facility where he answered about 500 questions by Dr. Cary D. Rostow, Ph.D., M.P., a clinical psychologist. Dr. Rostow noted in his written report:

> Officer Hewitt generally complied with the evaluation process, although he complained that he had already been "cleared" by another doctor and did not see the purpose. He did not refuse or attempt to refuse to submit to the examination. Officer Hewitt did not seek to change or alter the evaluation procedure.
>
> . . . .
>
> **Officer Hewitt understood and agreed to all conditions of the evaluation before it took place.**
>
> When asked why the department sent him for this evaluation, Officer Hewitt wrote:
>
>> I really don't know why I'm here. The Chief suspended me for five days for a [sic] incident which occurred on December 21, 2010. I'm currently try [sic] to get Civil Service to hear my side of the story in that matter with my lawyer. I really do not know why I'm here but I have

> to comply with what they ask. I was seen by another
> doctor before and he said I was Fit for Duty.

In his written "recommendations" Dr. Rostow further stated, in part:

> The following recommendations are based upon existing information,
> test data, interview information and what is believed to be the
> standards of police conduct and behavior expected in the department.
> It is not meant to be used alone, but can be a useful adjunct to decision
> making when combined with other information taken from
> administrative, supervisory and other sources.
>
> **Officer Hewitt has not complied with the requirements of the
> FFDE to a degree necessary for the examiner to come to a
> conclusion regarding his Fitness for Duty.**
>
>      . . . .
>
> **Officer Hewitt was in denial of responsibility for all possible
> errors or mistakes regarding any observed difficulties
> documented by his department. He did not seem aware of the
> possibility that any actions of his could be questionable or may
> have caused others to be critical of his conduct. The problem, in
> his view, always resided with the behavior or actions of others.
> This denial pattern continued in psychometric testing which was
> invalid due to the denial of universal minor faults that are noted
> in healthy and impaired persons. <u>Therefore, no statements may
> be made regarding his current Fitness for Duty</u>.**

In an interview on July 11, 2011, conducted by LPD Internal Affairs Detective Shawn Terro and Sergeant Keith Gremillion, Dr. Rostow reiterated that Hewitt "answered questions. He did not refuse. He did not tell me it was none of my business or he wouldn't talk to me about it." He further stated, "That's full compliance with the interview. He complied with the interview." Ultimately, Dr. Rostow did not render any opinion as to Hewitt's fitness for duty and was not called as a witness before the Board. However, Dr. Rostow did state in the interview that Hewitt's responses to his questions exhibited a failure to acknowledge even the most common character lapses and indicated that Hewitt considered himself persecuted. Dr. Latour could not be called as a witness because

5

he died before the hearing; therefore, his letter and written evaluation were entered in evidence.

In addition to the fit-for-duty inquiry, LPD opened four separate investigations into Hewitt's performance. On June 22, 2011, Chief Craft drafted a memorandum to Hewitt advising Hewitt that investigation AD2011-011 alleged that Hewitt failed to complete an off-duty request form; worked off-duty security detail while on administrative leave; failed to advise LPD that his address had changed; failed to return calls of internal affairs investigators, despite being required to be "on call" while on administrative leave; and "gross insubordination." On June 29, 2011, Chief Craft drafted a memorandum to Hewitt outlining the investigation of whether Hewitt was insubordinate in "failing to fully comply with requirements for a Fit for Duty Exam and for giving false information during the Fit for Duty Exam." This investigation was designated as AD2011-012. Another memorandum from Chief Craft to Hewitt dated June 29, 2011, outlined the investigation designated AD2011-013, "Between January 2010 through March 2011 you failed to submit numerous Misdemeanor Summons [sic], written statements, and physical evidence involving multiple criminal cases." The memorandum advising Hewitt of investigation AD2011-14 alleged Hewitt's "utilization of LCG [Lafayette Consolidated Government] computer for personal use and the location of a pornographic image on your LCG computer."

A pre-determination hearing was scheduled for August 25, 2011. The pre-determination hearing was abbreviated, with two recorded statements Hewitt gave investigators and some supporting documentation presented. No other testimony was offered. Hewitt was present and represented by counsel.

Hewitt was never returned to duty. Instead, he was kept on paid administrative leave, and then, on August 30, 2011, he was informed that he was

going to be terminated for twelve alleged infractions, most of which were alleged to have occurred while Hewitt was on administrative leave:

1. Failure to respond on June 14 & 15, re: phone calls and messages left by the Internal Affairs section.

2. Failure to complete a change of address form after moving to Acadian Gardens Apartments, located at 710 South College.

3. Failure to complete off-duty security request forms for UPA Apartments and Acadian Garden Apartments.

4. Worked off-duty security while on paid administrative leave.

5. Committed gross insubordination by violating the conditions of paid administrative leave.

6. Untruthful during the administrative investigation – additional allegations not based on complaint.

7. Failure to comply with the requirements of the Fitness for Duty examination to a degree necessary for Dr. Rostow to come to a conclusion.

8. Questionable images and personal documents found on [Hewitt's] assigned Lafayette Consolidated Government laptop computer.

9. Failure to submit a total of 11 Misdemeanor Summons' [sic] and associated written statements and evidence.

10. Failure to submit a Request for Off-Duty Employment form for Dillard's Department Store.

11. Termination from employment working off-duty at Dillard's Department Store for violating company rule or policy.

12. Ma[king] false and untrue statements during an Administrative investigation.

In June 2012, Hewitt and fifteen other officers of the LPD, many of whom were long-term employees, publicly alleged corruption and the existence of what they described as a "code of silence" within the LPD. These officers asserted that the LPD retaliated against them for refusing to participate in practices they considered improper and for exposing the alleged "code of silence." The officers and former officers filed suit in United States District Court for the Western

District of Louisiana, Lafayette Division, in the matter entitled *Marceaux v. Lafayette Parish Consolidated Government*, docket number 12-1532

The appeal of Hewitt's termination was heard by the Board on July 8, 2015. The Board upheld Hewitt's termination, with one dissenting vote. Hewitt timely appealed the Board's decision to the Fifteenth Judicial District Court, which was heard on September 19, 2016. The district court upheld Hewitt's termination on October 17, 2016.

## ASSIGNMENTS OF ERROR

Hewitt timely filed the present appeal, alleging the district court erred as assigned below:

1. The conclusions reached and the penalties imposed were not made in good faith and for just cause.

2. The rulings of the District Court upholding the decision of the Board was erroneous as the decision of the Board was not made in good faith and for just cause as the City of Lafayette and the Lafayette Police Department erroneously found that the alleged actions of Uletom Hewitt violated the provisions of the Lafayette Police Department Standard Operating Procedures.

3. The ruling of the District Court upholding the decision of the Board was erroneous as the decision of the Board was not made in good faith and for just cause as the City of Lafayette and the Lafayette Police Department erroneously found that the alleged actions of Uletom Hewitt impaired the efficient operation of the public service.

4. The ruling of the District Court upholding the decision of the Board was erroneous as the decision of the Board was not made in good faith and for just cause as the City of Lafayette and the Lafayette Police Department erroneously imposed discipline that was not commensurate with the alleged infractions.

5. The ruling of the District Court upholding the decision of the Board was erroneous as the decision of the Board was not made in good faith and for just cause as the appointing authority failed to comply with the Constitutional requirements enunciated by the Supreme Court in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed 2d 494 (1985).

## ANALYSIS

Hewitt was a classified civil servant. Under Louisiana Constitution Article I, § 2, Hewitt's status as a classified civil servant constitutes a property right that cannot be taken from him without due process of law:

> The Due Process Clause provides that the right to life, liberty and property cannot be deprived except pursuant to constitutionally adequate procedures. U.S. Const. amend. XIV; La. Const. Ann. art. X, § 8(A). A due process claim in the context of civil service employment depends upon an employee having a property right in continued comparable employment. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Tenured or classified civil service status is a property right and cannot be taken away without due process. *See* La. Const. Ann. art. I, § 2; *Wilson v. Jefferson Parish,* 95–470 (La.App. 5 Cir. 1/17/96), 668 So.2d 1167, *writ denied,* 96–413 (La.4/19/96), 671 So.2d 927; *Bell v. Department of Health and Human Resources,* 483 So.2d 945 (La.1986), *cert. denied,* 479 U.S. 827, 107 S.Ct. 105, 93 L.Ed.2d 55 (1986).

> . . . .

> Due process is a flexible standard and calls for such procedural protections as the particular situation demands. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). As the United States Supreme Court noted in *Loudermill,* "the right to due process is conferred not by legislative grace, but by constitutional guarantee." *Loudermill,* 470 U.S. at 541, 105 S.Ct. 1487 (quoting *Arnett v. Kennedy,* 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)). Although a state may establish certain statutory procedural safeguards to protect property rights, the safeguards may still be judged insufficient (depending on the facts and circumstances of a particular case) to guard the particular property interest at risk. *Loudermill,* 470 U.S. at 541, 105 S.Ct. 1487.

> '[The] central meaning of procedural due process is well settled. Persons whose rights may be affected are entitled to be heard; and in order that they may enjoy that right, they must first be notified.' *Wilson v. City of New Orleans,* 479 So.2d 891, 894 (La.1985). Correlatively, this right to notice and opportunity to be heard must be extended at a meaningful time and in a meaningful manner. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Armstrong v. Manzo,* 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).

*Moore v. Ware*, 01-3341, pp. 11-13 (La. 2/25/03), 839 So.2d 940, 948–49.

The appointing authority is mandated to operate effectively and, thus, has discretion in disciplining its employees for sufficient cause. *Shepack v. New*

9

*Orleans Police Dep't.*, 00-1345 (La.App. 4 Cir. 5/16/01), 791 So.2d 733. The civil service board's task is to review disciplinary actions and determine whether they were imposed for sufficient bases. *Id.* A trial court's review of a civil service board's actions is limited to determining whether the board acted in good faith and for legal cause. La.R.S. 33:2501(E)(3). "Good faith" has been established if the board's actions were not arbitrary or capricious or were not motivated by political expediency or prejudice. *Moore*, 839 So.2d 940. A board's actions are arbitrary or capricious if there is no rational basis for the actions. *Id.* The district court "should accord deference to a civil service board's factual conclusions and must not overturn them unless they are manifestly erroneous." *Id.* at 946. The court of appeal must accord the same deference to a civil service board's factual finding as it would to those of a trial court. *Id.* A factual finding is manifestly erroneous when there exists no reasonable basis for it in the record. *Stobart v. State through Dep't of Transp. and Dev.*, 617 So.2d 880 (La.1993).

Hewitt contends that he did not receive prior notice of the alleged untruthfulness infractions prior to the pre-determination hearings, in which he had a right to know all charges against him so that he might prepare a defense. While *Loudermill* does not require written notice of the charges against the employee, La.Const. Art. 10, §8 does. Complaint AD2011-012 alleged that Hewitt failed to comply with or gave false information to Dr. Rostow. Hewitt was adequately put on notice of these allegations.

LPD included in the twelve alleged infractions one concerning time clock issues at Dillard's and introduced documents from Dillard's demonstrating that Dillard's terminated Hewitt for cause based on falsifying time clock entries. The Dillard's' documents consisted of five pages including the facsimile cover sheet.

10

This issue was not raised in any of the notices sent to Hewitt and cannot be used as a basis for disciplinary action.

LPD's rules for disciplinary action are based on the stated philosophy "that discipline be utilized in a progressive and positive manner." Policy Procedure No. GO-204.5. LPD is specifically directed, "Discipline shall not be administered as punishment, but instead as a tool used in guiding the employee into being productive and accountable for their actions or inactions." LPD policy and procedure specifically sets forth the following:

SUPERVISOR'S RESPONSIBILITY

A. Except for gross breaches of discipline, supervisors shall attempt to begin employee discipline with the least punitive measures. If this fails to bring about positive change, then increasingly more severe measures may be required. While this process may take some time, supervisors shall ensure that each employee is dealt with justly, and in a manner which clearly indicates that positive, constructive measures utilized to change behavior or performance preceded the imposition of more negative sanctions.

B. First-line supervisors are in the best position to observe employee appearance and conduct. They shall detect those instances where formal or informal actions are warranted. First-line supervisors shall counsel employees informally, for minor infractions such as tardiness, abuse of duty time, inadequate or unsatisfactory job performance, abusive language, or disruptive behavior. Severe acts and misbehavior shall be brought up the chain of command. These types of actions will result in a more severe penalty.

Dismissals shall be made in cases of extreme malfeasance, misfeasance, or non-feasance of duty.

Under the rules governing disciplinary actions for LPD, infractions are subdivided into three categories of offenses, ranging from the least serious, identified as Category 1 offenses, to the most serious offenses, identified as Category 3. The LPD Rules set forth the evidentiary standard of proof as preponderance of the evidence. Category 1 minor offenses specifically include:

**Residence and telephone**

Each employee of the Department shall reside within the prescribed geographical limits of the LPD. Employees shall inform the Office of the Chief of Police, the Division Commander, their immediate supervisor, and the Watch Commander within (24) twenty-four hours of moving or changing telephone numbers. Every employee must list their residential street address (no post office boxes) and the telephone number assigned to their address."

**Completion and Submission of Required Forms**

Each employee of the Department shall complete all reports, forms, and any other required documents prior to the end of their tour-of-duty unless waived by their supervisor until the next day; in no case shall the time exceed (24) twenty-four hours. These required reports shall be presented to their supervisor for approval as required. In cases of grievances, it shall be processed and forwarded up the chain of command within the time limit specified in GO-204.4.

**Computer Usage**

Employees shall not engage in unauthorized use of computer equipment owned by the L.C.G./Lafayette Police Department, including, but not limited to, playing computer games, watching non-police related DVD's or movies, or utilizing such computers for personal business.

**Conduct Unbecoming an Officer**

Employees whether on or off duty shall follow the ordinary and reasonable rules of good conduct and behavior. They shall not commit any act in an official or private capacity that would bring reproach, discredit, or embarrassment to their profession, the Department, or which could constitute conduct unbecoming by an employee. Employees shall follow established procedures in carrying out their duties, and shall at all times use sound judgment.

The use and certification of Tasers is also covered under Category 1.

Category 2 offenses include use of alcohol or prescription medications that may impair an officer's ability to think clearly; loss of command of temper and use of derogatory, racist, or offensive language; being absent without leave; failing to fully cooperate with other officers or between agencies; failure to report lost or damaged equipment; damaging departmental equipment willfully or by neglect; traffic violations; license suspension; and computer usage for pornographic purposes.

Category 3 offenses include a felony or misdemeanor conviction; possession of illegal narcotics; failure to enter evidence into the LPD Evidence Unit; instituting an independent investigation of fellow officers or public officials without authorization of the Chief of Police; release of prisoners or allowing escape; unauthorized release of information; bribery or extortion; failure to provide information to a supervisor; conversion of confiscated property; sexual harassment; cowardice or desertion; failure to carry out orders; insubordination; falsification of documents; use of excessive force; association with known criminals, violations of laws, and knowingly making false or untrue statements.

The table of offenses which "shall be used as a guide for supervisory personnel" sets forth the recommended level of discipline for offenses:

> Cat (1) 1st offense: Conference letter of counseling or letter of reprimand; 3rd offense within five years Letter of reprimand or 5 day suspension.

> Cat (2) 1st offense letter of reprimand; three day suspension. 3rd offense within 5 years 5-day suspension.

> Cat (3) 1st offense: one day suspension, dismissal. 3rd offense within 5 years, 30 day suspension, dismissal.

> In deciding upon disciplinary action, the Chief of Police or Appointing Authority may consider the nature and severity of the violation, the personnel record of the employee, any recommendations by the employee's supervisor(s), and the disciplinary action imposed in prior cases of a similar nature.

Dr. Rostow confirmed that Hewitt cooperated in the fit-for-duty examination. Hewitt was told before he was interrogated by Dr. Rostow that information obtained by the examiner would not be used for criminal investigation (self-incrimination) purposes, and that he was free to leave or refuse to answer questions but must tell the truth in all answers that he submits. Dr. Rostow stated in his report: "**Officer Hewitt understood and agreed to all conditions of the evaluation before it took place.**" (Emphasis in original). Dr. Rostow was not

13

called to testify at the hearing to explain what he meant when he reported that Hewitt was not "truthful" in the interview for the fit-for-duty examination. We have, however, reviewed the written documents entered in evidence which provide insight into his meaning. Included in the record is a transcript of an Internal Affairs Interview of Dr. Rostow after he submitted his written report. Dr. Rostow stated in the interview that he describes Hewitt as being "untruthful" to him in testing because, "He gave me a history that is inconsistent . . . with the history I received from official documentation."

Dr. Rostow summed up his assessment of Hewitt in that interview (emphasis added):

> So, his idea is that he's doing what's right. He is doing what his understanding of his profession is. *Everybody else is a little bit off, a little bit too relaxed on the rules or somehow have the rules wrong and he is the standard by which others should judge him.* That's his attitude. It's not an illness. . . *But, it is very hard to live with in a paramilitary organization where you're expected to take and obey orders.*

One of the issues, though, LPD had with Hewitt's responses to Dr. Rostow was his failure to disclose, when asked about difficulties at other departments, that he had been suspended while an officer with the Grambling Police Department for an altercation with a fellow department employee. He also failed to disclose that he had received three reprimands and a suspension while employed at a correctional facility and was not eligible for rehire with the Ouachita Parish Sheriff's Office because he lacked "maturity and judgment and decision making." When confronted about these omissions during the investigations, Hewitt passed them off as irrelevancies. This sort of lack of candor was identified by Dr. Rostow as the reason he could not reliably opine as to Hewitt's fitness for duty.

Given Dr. Rostow's opinion that Hewitt was not truthful in his responses to the battery of questions included in the examination, we find that a reasonable

14

basis exists in the record that precludes a finding of manifest error on the issue of Hewitt's untruthfulness.

As previously noted, most of the alleged infractions which resulted in Hewitt's dismissal were discovered while he was on administrative leave. Many might constitute Category 1 offenses. However, the failure to process citations for an extended time rises to a different level than what is described in the LPD rules as a Category 1, which requires that reports and the like be completed by the end of an officer's tour of duty. Hewitt failed to process at least eleven criminal citations, written reports, and other evidence. The failure to submit these summonses, reports, and statements was explained by Hewitt as having been voided because he felt the evidence was insufficient; however, contact with the complainants in those cases did not corroborate this explanation. This is perhaps the most troubling of Hewitt's lapses, because it directly impacts both the alleged victims of the offenses, mostly businesses that had suffered theft loss, and the alleged perpetrators, who were awaiting disposition of the allegations against them. Further, these items were held in his cruiser by Hewitt far, far beyond the end-of-duty-tour deadline established in LPD rules. The mind struggles to conceive of a situation that might more seriously bear a real and substantive relation to efficient and orderly operation of Hewitt's service. That the Board did not believe his account of why those were not processed does not change the fact that a reasonable basis exists in the record for its determination.

There is no question regarding the location of a photograph of a nude female on Hewitt's department-issued laptop computer. Hewitt explained that a female friend emailed this photo to him and he inadvertently saved it to the hard drive of the computer. Nonetheless, the photo was there on the hard drive in violation of department policy.

A further example of Hewitt's lapses is that he worked off-duty security while on paid administrative leave. In April 2011, while on administrative leave, Hewitt moved from the UPA Apartments to Acadian Gardens Apartments, where he lived rent-free. Under the LPD rules, officers can accept rent reduction or free rent in exchange for residing at an apartment complex as what is called a "courtesy officer," which is sometimes accomplished merely by parking the officer's patrol unit at the complex. Hewitt was given free rent at the Acadiana Gardens Apartments in exchange for his presence at the complex as a courtesy officer. According to Hewitt's uncontradicted testimony, the only action he performed during this time occurred when he told the apartment manager to call 911 and then asked a few kids to get out of the swimming pool until police arrived. He explained he did nothing more than any responsible adult would have done under the circumstances and informed the manager he could not take any action as an off-duty officer, and that is the reason he instructed the manager to call 9-1-1. Hewitt argues that this incident forms the basis of the alleged infraction. However, the written instruction to Hewitt was that he could not "Perform any off-duty employment," and he was not to "take any police action or overt act, which could be construed as police action." Hewitt believed the rules did not prohibit his acceptance of free rent during administrative leave, as he did not understand this to constitute "performing" employment or engaging in any police action "or overt act which could be construed as police action." The directive, though, prohibited Hewitt from engaging in outside employment. Hewitt acknowledged his employment status with Acadian Gardens in the lease, which referred to him as "employee." He accepted something of value, a rent-free apartment, in exchange for his presence. Clearly, this would not have been offered to him were he not a police officer. The fact that he did not overtly engage in police activity does not

negate the fact that he was employed by the apartment complex. Under LPD rules requiring approval for off-duty employment and the orders Hewitt received when he was placed on administrative leave prohibiting him from accepting off-duty employment, accepting off-duty employment amounts to insubordination.

The members of the Board were very impressed with the failure of Hewitt to turn in the misdemeanor summonses. This was by far the issue with which they took the greatest umbrage. One member, Mr. Thomas Hays, opined that termination was warranted given Hewitt's prior disciplinary history. This is certainly an appropriate consideration. *See Hatzgionidis v. Dep't of Police*, 580 So.2d 471 (La.App. 4 Cir 1991). The only dissenting view on the Board was expressed by Mr. Craig Forsyth, who objected to the notion of police officers working private security altogether.

Lastly, while we do not find that the actions in the federal suit are authoritative in the present matter, they are noteworthy. Hewitt's claims were dismissed by the federal district court because any alleged constitutional violations were prescribed and, independent of the issue of prescription, the LPD was entitled to summary judgment on the merits:

> It is clear from the unrefuted evidence in this case that Mr. Hewitt's Constitutional rights were not violated by the defendants and he suffered no adverse employment action arising from retaliation.
>
> \* \* \*
>
> A simple reading of the record reveals that the disciplinary actions encountered by Mr. Hewitt in the form of paid administrative leaves, FFDEs, and administrative investigations were the direct result of his own bad acts. These are not adverse employment actions. His suspensions and ultimate termination are adverse employment actions, but the plaintiff has offered no proof whatsoever that they were in the form of retaliation. The defendants, however, have offered sufficient proof of a basis for taking such action and of reasonableness.
>
> \* \* \*

The record proves that Mr. Hewitt's own misconduct was the cause of his job related problems and the basis for the reasonable response by the defendants.

Based on the foregoing, the Court finds the defendants are entitled to Qualified Immunity as they acted with objective reasonableness in the actions taken with Mr. Hewitt and that Mr. Hewitt has failed to prove he suffered a violation of a Constitutional right. *In fact, given the facts as presented, which are undisputed by the plaintiffs, if the department had not taken such action against Mr. Hewitt, it likely would have been in violation of its obligation to the community to run an effective and professional department.*

*Marceaux v. Lafayette Par. Consol. Gov't*, 12-1532, 2014 WL 4817935, at 3-4 (W.D. La. Aug. 8, 2014), *aff'd.*, 614 F. App'x 705 (5th Cir. 2015). (Emphasis added).

## CONCLUSION

Hewitt was provided with adequate notice and opportunity to be heard on a majority of the allegations levied against him. We are, as stated above, required to accord the civil service board's decisions great deference. Its factual determination may not be overturned absent manifest error. If the board acted in good faith, demonstrated by a rational basis for its actions unmotivated by political expediency or prejudice, and for legal cause, we are required to uphold that action, even if we personally disagree with its actions and would have decided the matter differently. There is no proof that the board acted from political expediency or prejudice. There certainly exists a rational basis for its action. Even if one does not consider the more peripheral Category 1 infractions such as dismissal from Dillard's, the lack of candor with the investigators, the inappropriate image on his laptop, and his employment at his housing complex, the remaining and proven allegations form a sufficient basis for us to conclude that Hewitt was terminated in good faith and for legal cause. Indeed, the failure to process summonses, reports, and evidence alone would justify Hewitt's termination.

The judgment of the trial court is affirmed.  All costs of this appeal are taxed to Plaintiff/Appellant, Mr. Uletom Hewitt.

**AFFIRMED.**

**Cooks, J., dissents.**

If the majority's opinion stands the lesson learned here for all whistleblowers will be "never tell." Uletom Hewitt's (Hewitt) travails as a police officer did not start until he tried to make public what he and others allege was the illicit "code of silence" of the Lafayette Police department of longstanding. As we all know, no one is perfect on the job thus making all who dare to speak out vulnerable to character annihilation.

The majority makes brief reference to Hewitt's career as a police officer and sums up his career in short shrift: "Hewitt's supervisors, superior officers, and LPD Chief Jim Craft praised Hewitt on many occasions." From this complimentary introduction, the majority launches its review of Hewitt's last actions which the two conclude merits his discharge. Like the LPD, the majority paints the picture of an officer unworthy of rehabilitation as an employee and utterly unworthy to serve as a police officer. My thorough review of the record illuminates a very different picture of Hewitt and of the behavior of LPD.

Hewitt worked as a police officer for the Lafayette Police Department (LPD) from 2006 to August 30, 2011. He received his BA degree in criminal justice from the University of Louisiana at Monroe in 2000. Hewitt was an experienced law enforcement officer before joining the LPD. Prior to joining LPD, Hewitt worked as a police officer for the Grambling Police Department for roughly one year and as a deputy for the Ouchita Parish Sheriff's Office for approximately five years. During the six years prior to that he worked for the Lincoln Parish Detention Center and Richwood Correctional Center. Chief Tommy Clark, Grambling Police Department, "spoke very highly of Officer Hewitt." Chief Clark remarked that "Officer Hewitt has excellent work habits, has only used twelve hours of sick leave

while with the department, and is always willing to fill in even on short notice." He further stated he "hate[d] to lose Officer Hewitt but understands when a person wants to better themselves." When asked for his opinion regarding why Officer Hewitt has had several different jobs in law enforcement, Chief Clark responded that "he believed it to be a process of advancement and not due to any negative reasons." He further explained Officer Hewitt joined the Grambling Police Department because Chief Clark offered him a job after meeting him at the Lincoln Parish Detention Center. Warden Goree of the Lincoln Parish Detention Center "also spoke very highly of Officer Hewitt." She described him as "very disciplined, punctual, communicates well with others, follows instructions, and very professional." She expressed that she too "was not happy with losing Officer Hewitt as an employee but wished him well in his career."

Indeed, as the majority admits, Hewitt also enjoyed a commendable record with LPD for several years. A review of his employee evaluations made part of this record reflect Hewitt received multiple commendations and was heralded as a dedicated police officer. According to these evaluations and letters of commendation Hewitt was described by Chief of Police Jim Craft (Chief Craft) as "a model police officer." Hewitt's supervisors, superior officers, and Chief Craft praised Hewitt in writing on many occasions as follows: (1) On August 1, 2007 Chief Craft wrote he was "proud to have [Hewitt]on our team" describing him as "an ideal model for other officers;" (2) on August 31, 2007, Hewitt was singled out among a group of officers who received commendation for their efforts in a suicide situation "Hewitt did excellent work at the residence . . . The objective was accomplished in locating Steven before he hurt himself and seeing that he get medical attention;" (3) on October 26, 2007 Chief Craft commended Hewitt in writing "for handling [a difficult criminal matter] in such a professional and

21

efficient manner;"[1] (4) on April 21, 2008 Chief Craft again issued a written commendation to Hewitt stating "I want to thank you for performing your duties in such a professional and compassionate way as to have [a citizen] give me a call and write to commend you;" (5) and again on July 30, 2010, Hewitt was described as "an asset to [the] department and his squad, as well as the community."

At some point in time between this 2010 commendation and the spring of 2012, Hewitt and fifteen other officers of the LPD, many of whom were long-term employees, engaged in public discussions alleging corruption and the existence of what they described as a "code of silence" within the LPD. These officers asserted that the LPD retaliated against them for refusing to participate in practices they considered improper and for exposing the alleged "code of silence." Eventually they sought certain relief in state court. Finding those efforts unsuccessful, in early 2012, Hewitt along with fifteen fellow LPD officers filed suit in United States District Court for the Western District of Louisiana against the LPD and several individual defendants, including Chief Craft and Major Alfred, as well as Lafayette Consolidated Government.[2]

---

[1] This commendation arose out of a situation in which Hewitt became involved in pursuing a criminal matter at Lafayette General Hospital when the first two officers assigned failed to handle the situation because their shift ended. Hewitt spent the better part of a day tracking down the suspected criminal who had assaulted a woman and managed to make an arrest before more harm was done to the victim. He pursued the matter vigorously, even going outside his assigned precinct and working long after his shift ended. After apprehending the perpetrator he voluntarily worked late to handle the booking procedure personally. His handling of the matter earned him high praise and a written commendation.

[2] The ongoing dispute between the plaintiffs and defendants has been the subject of extensive media coverage with multiple extra-judicial comments being made in the print and television media. The extensive media coverage began in the spring of 2012 even before the initial judicial proceeding, which was a hearing in the 15th Judicial District Court for the Parish of Lafayette. In that proceeding the plaintiffs sought a temporary restraining order and injunction against the Lafayette Parish Consolidated Government. The TRO was denied, and the petition was dismissed with prejudice on May 29, 2012.[3] This suit followed on June 5.

*Marceaux v. Lafayette City-Par. Consol. Gov't*, 12-1532, 2012 WL 4194521, p. 2 (W.D. La. Sept. 19, 2012), *vacated in part*, 731 F.3d 488 (5th Cir.2013).

Following the glowing July 2010 commendation, and before the filing of the federal lawsuit in 2012, matters took a decidedly bad turn for Hewitt with the LPD. As the majority chronicles, Hewitt was suspended for five days without pay on March 3, 2011, based on the finding at a pre-determination hearing "that Mr. Hewitt disobeyed a direct order from a superior officer, Sergeant Starring, which caused panic and chaos, which unnecessarily alarmed the public." *Hewitt v. City of Lafayette*, 15-912, p. 3 (La. App. 3 Cir. 3/2/16), 186 So.3d 357, 359. Hewitt appealed the determination to the Board. On January 14, 2015, the Board upheld the decision and punishment as did the Fifteenth Judicial District Court and this court. *See Hewitt*, 186 So. 3d at 361.

On March 2, 2011, Hewitt was accused of failing to properly use his in-dash camera system in his police cruiser. A pre-determination hearing was held on this complaint and on August 8, 2011, Hewitt was suspended for seven days without pay. Hewitt appealed his suspension to the Board but it refused to hear the appeal on the basis that the suit pending in federal court precluded it from hearing Hewitt's appeal. In *Hewitt v. Lafayette Municipal Fire & Police Civil Service Board*, 13-1429 p. 10 (La.App. 3 Cir. 6/4/14), 139 So. 3d 1213, 1221, this court found the Lafayette Municipal Fire & Civil Service Board (Board) was "without legal cause to refuse to set hearings on Hewitt's appeals pursuant to La.R.S. 33:2501(A)." Consequently, this court held "**the Board failed to act in good faith and for just cause when it denied Hewitt a hearing on his appeals**." *Id*. (emphasis added) We further found the Board's refusal to conduct a hearing on Hewitt's appeals was "an arbitrary and capricious abuse of discretion." *Supra*. at 1224. The case was remanded to the district court "with an order to issue the writ of mandamus" ordering the Board to hear Hewitt's appeal. Hearings on Hewitt's appeal to the Board were held on January 14, 2015, eight months after this court's

23

ruling, at which time the Board upheld the suspension. Hewitt appealed to the district court and it upheld the Board's decision. This court affirmed the trial court ruling. *Hewitt*, 186 So.3d at 347. It could not be foreseen by this court at that time just how telling this initial capricious behavior of the Board would be regarding what was in store for Hewitt.

On March 25, 2011, Hewitt was placed on paid administrative leave pending a fit-for-duty exam. According to Hewitt he informed Dillards on that date that he was placed on administrative leave and thus ineligible to work off-duty detail. According to Hewitt's uncontradicted testimony, and written statements made part of the record, Dillards did not want to lose Hewitt as an employee, but under their employment policy they could not keep his position open for an undetermined amount of time. As Hewitt could not say how long his administrative leave would last Dillards had no choice but to terminate his employment. Further, according to Hewitt, Dillards invited him to apply for his job after the administrative leave was over. The majority notes LPD refers to documents placed in evidence at the hearing that indicate Dillards fired Hewitt for time clock issues and LPD made this accusation one of the alleged infractions deserving of termination. **It fails to note that no witness was called regarding any of the issues relating to Dillards and that the documents are not corroborated nor authenticated by any testimony from persons representing Dillards.**

While on security duty at Dillards prior to his termination, Hewitt believed he saw evidence of a bomb threat and sprang into action to evacuate patrons. As mentioned earlier, he was ultimately disciplined by LPD for his over-exuberant handling of the matter and this court affirmed his seven-day suspension which resulted from this incident. At the time it rendered that opinion this court was unaware of the details now before us. There is nothing in this record to show that

24

Dillards was displeased with Hewitt's handling of this incident nor did Dillards fire him as a consequence of his handling of that incident. In fact, documents in this record reflect he handled the situation inside Dillards well and to their satisfaction, but it was LPD's view that his alleged overstepping and rush to evacuate patrons potentially in harm's way served as cause for disciplinary action.[3]

After disciplining him for failing to adhere to his supervisor's instruction to cease the manner in which he was handling the matter with mall patrons, LPD placed Hewitt on administrative leave with pay pending a fit-for-duty examination. As the majority states:

> According to Hewitt, when he arrived for his shift duty at LPD he was told that he was placed on administrative leave effective immediately and that he would be informed later as to the reason therefor. He was required to surrender his weapon, taser, and summons book. He was not allowed to go to his police unit which was secured at LPD headquarters. He was instructed in very certain terms that **he was not to call, email, text or in any manner make any form of contact with the LPD or anyone at LPD until further notice.** He fully cooperated and acted professionally in the circumstances. When he indicated he was leaving to walk home the officers said they would give him a ride home. He initially refused their offer and said he would rather just walk. The officers in charge expressed their concern that it would not look good for a uniformed police officer to be seen walking home. Hewitt acquiesced [to their demands].

Chief Craft subsequently required Hewitt to submit to a fit-for-duty examination. Hewitt complied and reported to the Psychiatrist as instructed.

Dr. Thomas G. Latour, M.D. Psychiatrist (Dr. Latour) was assigned to evaluate Hewitt. Lafayette City/Parish Nurse, Kim Bare (Bare), the person in charge of referrals for such evaluations, normally referred employees to Dr. Latour. Upon completing the evaluation, Dr. Latour wrote in large lettering on the evaluation form "**I feel he is fit for duty.**" (emphasis added) On the same form Dr. Latour wrote the following (emphasis added):

---

[3] *See Hewitt v. City of Lafayette*, 15-912 (La.App. 3 Cir. 3/2/16), 186 So.3d 357.

MENTAL HALTH EXAMINATION: The patient is a casually groomed black male who appears to be in no acute distress. *He relates well to the interviewer.* His mood is one of depression and his affect is blunted. His speech is normal. He is oriented as to time, person, place and situation. His thought processes are intact without any looseness of associations. He denies having hallucinations. He is neither paranoid nor delusional. His memory is intact for recent and remote events. His intellectual functioning is considered to be fair and he has a good general fund of knowledge. . ."

The last sentence in this recitation was marked through by Dr. Latour, it read: "His judgment and insight are considered to be poor." Dr. Latour scratched through this comment by hand, drew an arrow from the scratched through comment to the bottom of the page, and wrote: "I do not agree with this statement." He then signed his name after the special notation. This signature is an obvious match to Dr. Latour's signature on the evaluation and an attached letter, an observation acknowledged by Chief Craft in his testimony before the Board. The majority notes: "The marks on the document may indicate that Dr. Latour did not agree with the assessment that Hewitt had poor judgment and insight, but it certainly raised the question of why he signed the form in the first place with the notation that Hewitt's judgment and insight are poor." This, says the majority, supports Chief Craft's conclusion that he could not "rely upon Dr. Latour's assessment." **The marks on the document clearly indicate *Dr. Latour did not agree with the assessment that Hewitt had poor judgment and insight*. It is also very clear, as Dr. Latour wrote in very large letters, he concluded Hewitt was "fit for duty."**

Chief Craft nevertheless ordered Hewitt to submit to another assessment by a firm in Baton Rouge, known as Matrix, Inc. (Matrix). Chief Craft reached this conclusion despite the fact that Dr. Latour had also put his finding in a typed letter to Bare. In that letter, dated April 11, 2011, the same date as the signed evaluation form, Dr. Latour wrote: "After reviewing all materials provided to me and after

26

evaluating Mr. Uletom Hewitt, *it is my professional opinion* that Mr. Hewitt is mentally fit for duty and is able to return to work." (Emphasis added) Dr. Latour included the telephone number where he could be reached for any questions concerning his evaluation.

After being instructed to report to Matrix for a second fit-for-duty evaluation, Hewitt was transported to Baton Rouge on June 21, 2011, in a police unit accompanied by two officers, to the facility where he was subjected to a barrage of some five hundred (500) questions for the better part of a day, without even a break for lunch. No explanation has ever been offered as to why Hewitt was not allowed to travel on his own to Matrix just as he had previously reported to Dr. Latour on his own. It is noteworthy that the second evaluation scheduled at Matrix was performed by a less credentialed expert than Dr. Latour. Cary D. Rostow, Ph.D., M.P., Clinical Psychologist (Rostow) conducted the fit-for-duty evaluation at Matrix. He noted in his written report:

> "**Officer Hewitt generally complied with the evaluation process**, although he complained that he had already been "cleared" by another doctor and did not see the purpose. **He did not refuse or attempt to refuse to submit to the examination. Officer Hewitt did not seek to change or alter the evaluation procedure.**
>
> . . .
>
> **Officer Hewitt understood and agreed to all conditions of the evaluation before it took place.** (Emphasis original) "When asked why the department sent him for this evaluation, Officer Hewitt wrote: 'I really don't know why I'm here. The Chief suspended me for five days for a(sic) incident which occurred on December 21, 2010. (The evaluation took place on 6/21/11.) I'm currently try [sic] to get Civil Service to hear my side of the story in that matter with my lawyer. I really do not know why I'm here but I have to comply with what they ask. I was seen by another doctor before and he said I was Fit for Duty."

In his written "recommendations" Rostow further stated:

> The following recommendations are based upon existing information, test data, interview information and what is believed to

be the standards of police conduct and behavior expected in the department. It is not meant to be used alone, but can be a useful adjunct to decision making when combined with other information taken from administrative, supervisory and other sources[.]

Officer Hewitt has not complied with the requirements of the FFDE to a degree necessary for the examiner to come to a conclusion regarding his Fitness for Duty.

. . .

Officer Hewitt was in denial of responsibility for all possible errors or mistakes regarding any observed difficulties documented by his department. He did not seem aware of the possibility that any actions of his could be questionable or may have caused others to be critical of his conduct. The problem, in his view, always resided with the behavior or actions of others. This denial pattern continued in psychometric testing which was invalid due to the denial of universal minor faults that are noted in healthy and impaired persons. Therefore, no statements may be made regarding his current Fitness for Duty. (Emphasis original)

The majority acknowledges that: "In an interview on July 11, 2011, conducted by LPD Internal Affairs' Detective Shawn Terro and Sergeant Keith Gremillion, Rostow reiterated that Hewitt "answered questions. He did not refuse. He did not tell me it was none of my business or he wouldn't talk to me about it." He further stated '**That's full compliance with the interview. He complied with the interview.**' Ultimately, Rostow did not render any opinion as to Hewitt's fitness for duty. . ." (Emphasis added) Although he was interviewed at length Rostow was not called as a witness at the Board hearing to explain his comments and observations. Dr. Latour could not be called as a witness because he died before the hearing, therefore his letter and written evaluation were entered in evidence. As an M.D. Psychiatrist he clearly found after examining Hewitt in his "professional opinion" he was fit for duty. Allegedly, when he was asked to explain the scratch out he simply replied he had nothing more to add.

Hewitt was never returned to duty. Instead, he was kept on paid administrative leave and then informed that he was going to be terminated for

28

twelve alleged infractions, set forth in the majority opinion, most of which are alleged to have occurred while Hewitt was on administrative leave. A review of these alleged infractions reveals that under LPD's internal rules ten of the alleged twelve infractions are Category 1 offenses, defined in LPD's Rules as "minor offenses," and two may be Category three offenses, the most serious category.

Hewitt was terminated on August 30, 2011, and although he timely appealed his termination the appeal was not heard until July 8, 2015. As noted, the Board had refused to hear Hewitt's appeals awaiting disposition of the case pending in federal district court. The Board upheld Hewitt's termination with one dissenting vote in his favor. He timely appealed the Board's decision to the Fifteenth Judicial District Court which appeal was heard on September 19, 2016. The district court signed the judgment on October 17, 2016, upholding Hewitt's termination. He timely filed the present appeal alleging five assignments of error detailed by the majority.

It is undisputed in this case that Hewitt was a tenured civil servant when he was terminated from his employment with the LPD. The majority acknowledges that under Louisiana Constitution Article I § 2, Hewitt's status as a tenured or classified civil servant constitutes a property right which cannot be taken from him without due process of law:

> The Due Process Clause provides that the right to life, liberty and property cannot be deprived except pursuant to constitutionally adequate procedures. U.S. Const. amend. XIV; La. Const. Ann. art. X, § 8(A). A due process claim in the context of civil service employment depends upon an employee having a property right in continued comparable employment. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Tenured or classified civil service status is a property right and cannot be taken away without due process. *See* La. Const. Ann. art. I, § 2; *Wilson v. Jefferson Parish,* 95–470 (La.App. 5 Cir. 1/17/96), 668 So.2d 1167, *writ denied,* 96–413 (La.4/19/96), 671 So.2d 927; *Bell v. Department of Health and Human Resources,* 483 So.2d 945

(La.1986), *cert. denied,* 479 U.S. 827, 107 S.Ct. 105, 93 L.Ed.2d 55 (1986).

. . . .

Due process is a flexible standard and calls for such procedural protections as the particular situation demands. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). As the United States Supreme Court noted in *Loudermill,* "**the right to due process is conferred not by legislative grace, but by constitutional guarantee**." *Loudermill,* 470 U.S. at 541, 105 S.Ct. 1487 (quoting *Arnett v. Kennedy,* 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)). Although a state may establish certain statutory procedural safeguards to protect property rights, the safeguards may still be judged insufficient (depending on the facts and circumstances of a particular case) to guard the particular property interest at risk. *Loudermill,* 470 U.S. at 541, 105 S.Ct. 1487.

'**[The] central meaning of procedural due process is well settled. Persons whose rights may be affected are entitled to be heard; and in order that they may enjoy that right, they must first be notified.**' *Wilson v. City of New Orleans,* 479 So.2d 891, 894 (La.1985). Correlatively, this right to notice and opportunity to be heard must be extended at a meaningful time and in a meaningful manner. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Armstrong v. Manzo,* 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).

*Moore v. Ware*, 01-3341, pp. 11-13 (La. 2/25/03), 839 So.2d 940, 948–49

(emphasis added).

The most serious accusations lodged against Hewitt focus on his alleged "untruthfulness" during an administrative investigation. If proved by LPD his untruthfullness would amount to gross insubordination and would provide just cause for termination. But, allegations of untruthfulness raised here cannot form the basis for Hewitt's termination for two reasons. First, Hewitt did not receive prior notice of the alleged untruthfulness infractions prior to the pre-determination hearings in which he had a right to know all charges against him so that he might prepare a defense. The majority admits the state constitution requires adequate notice. In complaint AD2011-011 there was no mention of "untruthfulness violations" or the basis therefor in either the memorandum from Chief Craft to

Hewitt or in the notice of the hearing sent from Major Randy Vincent. Likewise, in complaint AD2011-12 Chief Craft's memorandum to Hewitt notifying him of three combined investigations did not mention untruthfulness infractions nor did Major Ned Ewing mention such infractions in his notice to Hewitt of the pre-disciplinary hearing. Additionally, neither Chief Craft nor Major Ewing mentioned in either of their memos to Hewitt regarding complaint Ad 2011-012 anything about the allegations regarding his termination from Dillards or his failure to provide an updated off-duty request form for Dillard's. Hewitt had no notice prior to the pre-determination hearings of these alleged infractions and was not given any explanation of the evidence LPD intended to use to prove these allegations. Nevertheless, the majority erroneously concludes Hewitt was adequately put on notice as to allegations contained in AD2011-012 ("that Hewitt failed to comply with or gave false information to Dr. Rostow"). I disagree for the reasons stated herein. The majority does admit, and finds that the allegations concerning the Dillard's time clock issues cannot be used to discipline Hewitt because of the failure to give adequate notice. I agree with that finding for the same reason as the majority and for additional reasons discussed herein.

The second reason I reject these allegations as a valid basis for termination of Hewitt's employment is that even if Hewitt had received notice of these alleged infractions they would not amount to an untruthfulness violation as I read the applicable employment rules of the LPD and Lafayette Consolidated Government (LCG). Concerning the untruthfulness allegations based on Hewitt's responses to Rostow, I believe his responses cannot be classified as deliberately "untruthful" as that term is used in the LPD rules. Rule 1.20 requires LPD employees to "cooperate and assist in any work-related administrative investigation and to answer any related questions completely and truthfully." Rule 2.14 prohibits any

31

"*Deliberate falsification* of any form, record or report." (Emphasis added) The evidence does not show that Hewitt violated either of these rules. Both Dr. Latour and Rostow confirm that Hewitt willingly cooperated and assisted them in the fit-for-duty examinations and there is no evidence that Hewitt deliberately falsified any information on any form or report. Hewitt was told before he was interrogated by Rostow that information obtained by the examiner would not be used for criminal investigation (self-incrimination) purposes, and that he was free to leave or refuse to answer questions but must tell the truth in all answers that he submits. Rostow stated in his report: "**Officer Hewitt understood and agreed to all conditions of the evaluation before it took place.**" (Emphasis in original) Rostow was not called to testify at the hearing to offer an explanation of what he meant when he reported that Hewitt was not "truthful" in the interview for the fit-for-duty examination. The written documents entered in evidence provide insight into his meaning. Included in the record is a transcript of an Internal Affairs Interview of Rostow after he submitted his written report. **Significantly, Rostow *does not maintain Hewitt intentionally fabricated* his responses.** Rostow says in the interview that he describes Hewitt as being "untruthful" to him in testing because: "He gave me a history that is *inconsistent . . . with the history I received from official documentation*" (emphasis added). In further explaining Hewitt's responses to the information provided to Rostow by LPD he says he cannot say that Hewitt has any mental illness:

> It's not an illness. It's an attitude. It's a belief system. He brought it to the department and probably he had it in another department earlier. It's a guess, but I suspect this is the case and now you have to cope with it. So, what can be done to make him different? I don't know of anything. I don't know.

Rostow summed up his assessment of Hewitt in that interview (emphasis added):

> *So, his idea is that he's doing what's right. He is doing what his understanding of his profession is.* Everybody else is a little bit off, a little bit too relaxed on the rules or somehow have the rules wrong and he is the standard by which others should judge him. That's his attitude. It's not an illness. ***I got a school of people like that. They're successful psychologist. (sic)* It's not an illness**. But, it is very hard to live with in a paramilitary organization where you're expected to take and obey orders.

Nothing in Rostow's remarks equates to deliberate or intentional "untruthfulness" of the sort proscribed by the LPD rules which would amount to insubordination. As Rostow points out, <u>*Hewitt was not fabricating*</u> his responses. He answered the questions truthfully in accordance with what he earnestly believed to be the truth. It must be remembered that Hewitt has long maintained that the LPD operates under a code of silence and engages in corrupt practices and retaliation against employees who do not go along with the program. As I have already stated, his belief in these accusations was so strong that he joined fifteen other officers who alleged the same thing in a suit filed in federal district court. Hewitt was dismissed from the suit on the basis of prescription. Contrary to the majority's assertion, no court to date has determined the "truthfulness" of those allegations on the merits.

The majority attempts to bolster its finding on mere *obiter dicta* in the federal district court's ruling on the exception of prescription raised as grounds to dismiss Hewitt as a plaintiff in the matter. LPD asserted before the Board, and again argues in this court, that the federal district court in *Marceaux v. Lafayette Parish Consolidated Gov't*, 2014 WL 4817935 (W.D. La. Aug. 8, 2014), 614 F.App'x 705 (5th Cir. 2015) made a finding of fact that Hewitt engaged in prohibited conduct which justified his termination of employment. LPD has often pointed to statements by Judge Haik in the federal case as an adjudication of the issues but that is not so. Any of the judge's pontifications were dicta. The only

issue before the federal court upon which it rendered judgment as to Hewitt was the issue of prescription. The court did not conduct a trial on the merits in ruling on the exception of prescription. In *Alpine Meadows, L.C. v. Winkler*, 49,490 p. 12 (La.App. 2 Cir. 12/10/14), 154 So.3d 747, 757, *writ denied*, 15-0292 (La. 4/24/15), 169 So.3d 357 the court found:

> In addressing that matter, which was **not** essential to our review of the summary judgment, this court rendered an advisory **opinion** that must be considered as purely *obiter dicta* and **not** binding on either the lower court or this court. *Meaux v. Wendy's Intern., Inc.,* 2010–2613 (La.5/13/11), 69 So.3d 412 . . .

In *Thomas v. K-Mart Corp.,* 525 So.2d 24, 29 (La.App. 3 Cir. 1988), *writ denied*, 525 So.2d 1045 (La.1988), and *writ denied*, 525 So.2d 1045 (La.1988) the court held that the trial judge's statement in his reasons for judgment that "he considered the testimony of Dr. McDaniel to be 'more accurate and correct than Dr. Blanda'" *Thomas*, 525 So.2d at. 29, **was obiter dicta and could not be considered "a finding"** *Id***., by the trial court**. *Likewise, the federal trial judge's statements in his reasons for judgment concerning the cause(s) for terminating Hewitt's employment are not findings of fact, as LPD and the majority insists, and carry no precedential value*. Judge Haik's dicta cannot be used to bolster LPD's argument or the majority's findings.

Hewitt complied with Rule 1.20 in the fit-for-duty examination conducted by Rostow according to Hewitt's testimony, Rostow's reports, and the interview by LPD investigators. Rostow's report and interview reflect his admissions that Hewitt *cooperated and assisted* with that examination and answered over 500 written and oral questions for the better part of a day. He answered Rostow's questions completely and in accordance with his personal take on the circumstances he was asked about. The fact that Hewitt refused to agree with the LPD's version of events or agree to their correctness, which he openly disputed,

does not make him "untruthful" and does not amount to a willful violation of Rule 1.20.

LPD included in the twelve alleged infractions one concerning time clock issues at Dillards and introduced documents from Dillards purporting to show that Dillards terminated Hewitt for cause based on falsifying time clock entries. The purported Dillards' documents were sent to LPD via facsimile transmission dated August 8, 2011, consisting of five pages including the facsimile cover sheet. The majority finds, and I agree, that Hewitt did not receive proper prior notice of this accusation and thus it cannot be used as a basis for disciplinary action. But, for the sake of completeness, I point out that even if he had received proper notice this alleged infraction is unsupported by the record. According to Hewitt's uncontradicted testimony he did not know about this issue with Dillards prior to the hearing. His testimony is corroborated by the fact that the "Separation Data Form" from Dillards recites that Hewitt was "unavailable for signature" and that notation is dated March 25, 2011. Hewitt testified he informed Dillards on March 25, 2011, of his administrative leave and the fact that such made him unable to continue his off-duty assignment at Dillards. Although there was a forwarding address for Hewitt on the form it is blacked out. This form contains language requiring that an employee receive a copy of the form allowing the employee the opportunity to comment on the matter addressed in the form. But this requirement was not met and Hewitt was accorded no opportunity to respond to these allegations. The next page contains a "Statement of Action Taken," which sets forth the purported reason for Hewitt's termination and recites March 24, 2011 as his last day of employment. This document is followed by another page which contains the signature of a person identified as an assistant store manager for Dillards, Joshua Koenig, and it is dated February 2, 2011. Such would indicate

that the "action taken," i.e. termination of Hewitt's employment, occurred on February 2, 2011, and yet the previous page indicates it occurred on March 24, 2011, and indicates the form memorializing this was "completed" on March 25, 2011, curiously the same date Hewitt was placed on administrative leave. This page also provides for comments by the employee and a place for the employee's signature and date, all of which are blank. The last page attached by Dillards to its facsimile transmission shows a list of dates and times clocked in and out but nothing on that page evidences who these dates and times relate to and do not, standing alone, offer any proof of the alleged reason for Hewitt's termination from Dillards. Thus, Hewitt's testimony regarding his termination from Dillards stands uncontradicted and LPD's version is not supported by properly authenticated documents or any sworn testimony from any representative of Dillards.

Hewitt's explanation of why Dillards terminated his off-duty employment also does not equate to Hewitt violating the untruthful provisions of the LPD rules. Hewitt's uncontradicted testimony about his termination from Dillards offers a different explanation for the termination than the unsupported and confusing employment documents relied on by LPD. LPD was in possession of the documents as of August 8, 2011 but no one was called as a witness from Dillards. Hewitt offered the only testimony concerning the matter. He testified that, in compliance with LPD rules, he immediately informed Dillards about his administrative leave and that such prohibited his continued off-duty service there. Nothing contradicts that testimony. According to Hewitt, Dillards wanted him to return to work as soon as the administrative leave ended. The facts accord some measure of credibility to Hewitt's account given that in the previous incident involving Dillards and the mall, despite that LPD disciplined Hewitt for his handling of mall patrons, **Dillards was not displeased with his handling of their**

**customers and continued his employment after that episode.** Moreover, Hewitt offered in his uncontradicted testimony a plausible explanation for the discrepancies in the time clock entries. According to his testimony Hewitt would have reason to leave the store through exits other than where the time clock was located in fulfilling his duties and re-enter the same way. This occurred when he followed patrons out of the store to ensure their safety in the parking lot or to observe suspicious activity in the parking lot. According to his testimony the time clock door was observed by a camera operator who would not allow anyone to exit there without clocking out. Thus, any time Hewitt used that exit he clocked in and out. Nothing was offered to dispute Hewitt's testimony except for the four-page document allegedly generated by Dillards. That document was never authenticated and it contains internally inconsistent information. No witnesses were called to present Dillards' side of the story. Further, it is difficult to imagine how this internal dispute at Dillards could be said to have a substantial impact on the operations of the LPD. No evidence was put forward by LPD to show how this issue substantially impaired the efficient operations of the LPD. It appears to have been just adding to the pile for effect.

Hewitt's uncontradicted statement as to what precipitated his termination of employment at Dillards is not intentional dishonesty and does not equate to being untruthful as proscribed in LPD's rules. Additionally, I reiterate, LPD does not dispute that Hewitt complied with Rule 1.20 in the fit-for-duty examination conducted by Dr. Latour who concluded without reservation, after considering all of the information provided him by LPD and Hewitt, that Hewitt was fit for duty and could be returned to work. For these reasons I believe the allegations of insubordination based on untruthfulness could not be considered, and even if they

37

could have been addressed LPD failed to meet its burden to prove Hewitt violated its rules on truthfulness.

As the majority recognizes, LPD's rules for disciplinary action are based on the stated philosophy "that discipline be utilized in a progressive and positive manner." Policy Procedure No.: GO-204.5. LPD is specifically directed as follows: "**Discipline shall not be administered as punishment, but instead as a tool used in guiding the employee into being productive and accountable for their actions or inactions**" (Emphasis added). Although the majority includes these policies in its opinion I repeat them here with emphasis on the language I believe is vitally important to a proper decision in this matter:

SUPERVISOR'S RESPONSIBILITY

**C.** Except for gross breaches of discipline, supervisors **shall attempt to begin employee discipline with the least punitive measures. If this fails to bring about positive change, then increasingly more severe measures may be required. While this process may take some time, supervisors shall ensure that each employee is dealt with justly, and in a manner which clearly indicates that positive, constructive measures utilized to change behavior or performance preceded the imposition of more negative sanctions.**

D. First-line supervisors are in the best position to observe employee appearance and conduct. They shall detect those instances where formal or informal actions are warranted. First-line supervisors shall counsel employees informally, for minor infractions such as tardiness, abuse of duty time, inadequate or unsatisfactory job performance, abusive language, or disruptive behavior. Severe acts and misbehavior shall be brought up the chain of command. These types of actions will result in a more severe penalty.

**The progression of discipline is counseling, remedial training, oral reprimand, letter of counseling, mandated counseling by E.A.P. or similar program.** Oral warnings are for minor infractions and are purged from employee record on first day after employee's annual evaluation. Letter of Counseling is final informal action and is served on employee "who is in violation of the rules, regulations, procedures, or policies of LPD. The purpose of the letter is to offer constructive criticism of an employee's behavior, action/inaction or appearance." "letters of counseling shall be purged one year from date of the incident."

38

Oral Reprimand can only be issued by Chief of LPCG. "At the time of an oral reprimand, the affected employee shall be counseled as to the correct behavior." Letter of reprimand can only be issued by Chief or LPCG. A letter of reprimand remains part of employee's record for not mre than 18 months. Demotion, suspension, reduction of pay. Chief or LPCG.

**Dismissals shall be made in cases of extreme malfeasance, misfeasance, or non-feasance of duty.** (Emphasis added)

The majority outlines the rules governing disciplinary actions for LPD and the three categories of offenses. **As I have previously noted, most of the alleged infractions which resulted in Hewitt's dismissal occurred while he was on administrative leave and the ten infractions which might form the basis for discipline are all Category One minor offenses.** *The majority ignores the important fact that there was no attempt by LPD to comply with the requirement to progressively discipline Hewitt for any of the infractions which formed the alleged basis for his termination of employment.* None of the remaining ten alleged Category One minor offenses resulted in any counseling by a supervisor. There was no oral reprimand, no letter of counseling, no "mandated counseling by E.A.P." and no remedial training. LPD did not make any attempt to follow its own mandated guidelines and directives in dealing with the alleged infractions of Hewitt. Hewitt was placed on paid administrative leave ostensibly for a fit-for-duty exam, but when Dr. Latour pronounced him fit-for-duty he was not returned to work. Instead, he was sent to an out-of-town facility in Baton Rouge to be examined by a less qualified expert than Dr. Latour. After subjecting Hewitt to a lengthy and rigorous examination Rostow could not reach a conclusion. Still, Hewitt was not returned to work but was continued on paid leave and ultimately accused of a litany of minor offenses while on leave.

The statutory and jurisprudential law concerning dismissal of tenured civil servants like officer Hewitt requires that such actions be made for cause, **in good**

**faith**, and must not be arbitrary or capricious. A proper appellate review must consider two determinations: "(1) whether the appointing authority had good or lawful cause for taking the disciplinary action, and (2) whether the punishment the appointing authority imposed is commensurate with the offense." *Abbott v. New Orleans Police Department*, 14-993, p. 8 (La.App. 4th Cir. 2/11/15), 165 So.3d 191, 197-98 and cases cited therein. Additionally, LPD must prove by a preponderance of evidence that the infractions of its rules complained of occurred and that the employees actions or inactions "bore a real and substantial relationship to the efficient operation" of the LPD. *Green v. New Orleans Recreation Development Comm'n.*, 16-1122, p. 17 (La.App. 4th Cir. 5/10/17), 220 So.3d 165, 176 and cases cited therein. The majority opinion fails to meet this standard.

The Louisiana State Supreme Court, in *Moore v. Ware*, 01-3341, p. 7 (La.2/25/03), 839 So.2d 940, 945-46 (emphasis added) set forth an appellate court's standard of review:

> An employee under classified service may appeal from any decision of the civil service board that is prejudicial to him. La.Rev.Stat. Ann. § 33:2501(E)(1). Such an appeal shall be taken to the district court wherein the civil service board is domiciled. *Id.* This hearing "shall be confined to the determination of whether the decision made by the board was made in good faith for cause" and "[n]o appeal shall be taken except upon these grounds." La.Rev.Stat. Ann. § 33:2501(E)(3).

> If made in good faith and statutory cause, a decision of the civil service board cannot be disturbed on judicial review. *Smith v. Municipal Fire & Police Civil Service Bd.,* 94-625 (La.App. 3 Cir. 11/02/94), 649 So.2d 566; *McDonald v. City of Shreveport,* 655 So.2d 588 (La.App. 2 Cir.1995). **Good faith does not occur if the appointing authority acted arbitrarily or capriciously, or as the result of prejudice or political expediency.** *Martin v. City of St. Martinville,* 321 So.2d 532 (La.App. 3 Cir.1975), *writ denied,* 325 So.2d 273 (La.1976). **Arbitrary or capricious means the lack of a rational basis for the action taken**. *Shields v. City of Shreveport,* 579 So.2d 961, 964 (La.1991); *Bicknell v. United States,* 422 F.2d 1055 (5 Cir.1970).

LPD's lack of good faith and capriciousness in its termination of Hewitt's employment is evidenced by several facts. First, as noted above, the utter and complete failure of LPD to make any attempt to follow its own dictates concerning progressive discipline especially for offenses defined by its own rules as "minor" Category One offenses. Second, the fact that, **despite its firm instruction to Hewitt not to contact the department or any department personnel by any means including telephone calling, texting, and/or email, LPD listed as cause for termination Hewitt's failure to contact LPD.** Hewitt was directly ordered when placed on administrative leave on March 25, 2011, in writing as follows:

> You are being placed on Administrative Leave, with pay, until further notice. This leave and its conditions are effective immediately.
>
> **While on Administrative Leave, you must adhere to the following conditions**: (emphasis original)
>
> A. If the Officer is placed on administrative leave he shall remain available during regular business hours; Monday to Friday 8:00 a.m. to 5:00 p.m. and he shall be available for any of the following:
>
> 1. Counseling sessions as mandated by the Department;
>
> 2. As directed by the Chief of Police;
>
> 3. You are directed to undergo a fitness for duty evaluation. Report to the City nurse on Monday—March 28, 2011 at 10:30 a.m. to complete the necessary paperwork for the doctor's appointment. You are then directed to report to the office of Dr. Thomas Latour on March 31, 2011 at 12:00 PM for evaluation/examination. . .
>
> In addition, while on administrative leave, you will not be allowed to:
>
> **Perform any Off-duty employment and you will not take any police action or overt act, which could be construed as police action**. (Emphasis original)
>
> You will not come to the Police Department unless summoned by the Chief of Police or Internal Affairs.

If summoned, you will enter through the front lobby entrance and wait there until escorted by the watch Commander or his designee.

**You will have no contact via person, phone, email or any other method of correspondence with any department personnel.** (Emphasis added)

> **Violation of any criteria listed in this memo will be considered a Major Offense under PPM 261-1, Conditions of employment, which states:**
>
> **Major offenses are those <u>willful or deliberate violations that exceed those considered correctable by progressive, corrective disciplinary action</u> and which may result in immediate discharge without consideration of employment history or past performance. Major offenses include paragraph d., which states:**
>
> **Gross insubordination, consisting of a repeated refusal or failure to comply with a lawful directive given by a supervisor or superior after having been warned of the potential consequences of such actions (Section 1.18, 2.4. and 2.9 of this PPM).** (Emphasis original)

LPD made two phone calls to Hewitt while he was on administrative leave which he did not return, and, despite its own instruction to him forbidding such contact, sought to discipline him for such failure to follow the normal rules. There was no message left for Hewitt concerning these calls and no way he could know that the calls came from Internal Affairs investigators. He testified that the number was not a number he recognized. This resulted in a one-day delay in LPD making contact with Hewitt. **Putting Hewitt in such a catch 22 position is capricious, i.e. it is not reasonable or rational.** Likewise, despite this prohibition on contact by any means LPD's investigation, identified as AD2011-011, was based on Hewitt's alleged failure to send in a change of address form. The evidence shows Hewitt was placed on administrative leave on March 25, 2011. At that time he was living at UPA Apartments and in fact, that is where the officers who drove him home brought him to. He did not move in to the Acadian Gardens apartment until

April 5, 2011. He was prohibited by the written order placing him on administrative leave from "any correspondence" with the department. Further, Hewitt testified that when he was summoned to LPD headquarters later in April of 2011, he requested a change form.

Third, when LPD presented evidence of Hewitt's alleged "untruthfulness" regarding Hewitt's responses to Rostow's questions it was not forthcoming with all of the information in its possession. As discussed previously, LPD asserts that Hewitt was untruthful in responding to Rostow about how his superiors and fellow workers perceived him. As I have already stated, Hewitt's responses do not constitute a violation of the rules regarding truthfulness. The evidence of Hewitt's allegedly untruthful responses was obtained by LPD sending an employee to north Louisiana to look into Hewitt's law enforcement employment history. LPD's agent obtained information from Hewitt's previous employers in that area of the state which information is in this record. Upon reviewing this information it is readily apparent that LPD focused only on the few negative comments made by any of his former employers and **ignored the overwhelmingly positive assessments** of Hewitt by these employers in order to fashion this information into a strained basis to allege that Hewitt was "untruthful" when he told Rostow he had a good reputation among his fellow officers and supervisors. **This was not rational behavior**. It is indicative of LPD's capriciousness. Moreover, the evidence shows that Hewitt's assessment of his professional reputation among his peers and supervisors *was not dishonest*. Even the majority admits as much. A reading of the entire report on the information gathered in north Louisiana reveals Hewitt did in fact enjoy a very fine reputation among his peers and he is especially lauded by his former supervisors as I have painstakingly chronicled in this dissent. Additionally, even his superiors at LPD, including Chief Craft and several other

superiors, repeatedly referred to him as a "model police officer" and a "valuable asset to the LPD and the community." **It is capricious, irrational behavior at the very least for LPD to make an allegation of "untruthfulness," a serious level three infraction, based on whimsically picking and choosing information and ignoring the clear assessments by prior and current supervisors which clearly demonstrate that Hewitt's assessment of his own reputation was anything but false.** Further, I note too, that it is unclear from Rostow's query whether he was referring only to Hewitt's present employment or whether he meant to include all of Hewitt's past employment as well. Such ambiguity cannot form a basis to accuse Hewitt of being deliberately untruthful in his responses.

Further examples of LPD's capriciousness are its accusations that Hewitt "worked off-duty security while on paid administrative leave" and "committed gross insubordination by violating the conditions of paid administrative leave." The factual basis for these alleged infractions involve Hewitt's living arrangement at an apartment complex. Under the LPD rules officers are allowed to accept rent reduction or free rent in exchange for residing at an apartment complex as what is called a "courtesy officer," which is sometimes accomplished merely by parking the officer's patrol unit at the complex. In Hewitt's case he was given free rent in exchange for his mere presence at the complex as a courtesy officer. According to Hewitt's uncontradicted testimony the only thing he ever did during this time period at the apartment complex was on one single occasion when he told the apartment manager to call 911 and then asked a few kids to get out of the swimming pool until police arrived. He explained he did nothing more than any responsible adult would have done under the circumstances and informed the manager he could not take any action as an off-duty officer and that is the reason he instructed the manager to call 911. It is this incident which forms the basis of

44

the alleged infraction. The written instruction to Hewitt was that he could not "Perform any off-duty employment" and he was not to "take any police action or overt act, which could be construed as police action." Hewitt believed the rules did not prohibit his acceptance of free rent during administrative leave as he did not understand this to constitute "performing" employment or engaging in any police action "or overt act which could be construed as police action." He specifically refused to engage in any such activity at the apartment complex as evidenced by his remarks to the manager and his instructing the manager to call 911. Additionally, off-duty officers are required to wear their police uniform when engaging in any off-duty employment, such as Hewitt's off-duty employment at Dillards. He did not equate living rent free in exchange for his mere un-uniformed presence as engaging in any police action or activity. When he was informed that LPD considered this too was prohibited, he promptly reimbursed the rent. The language of the rule is not clear as to whether the acceptance of free rent as a "courtesy officer" while on administrative leave would be improper. This was the first instance of such an infraction, an offense defined in the rules as a minor, Category One offense. Under LPD's rules for such a first offense the prescribed disciplinary action is a "conference letter of counseling or letter of reprimand." Even a third offense within a five-year period results only in "A letter of reprimand or five-day suspension." But Hewitt received no progressive discipline as required by the LPD rules; instead, these facts were used as a stated cause for termination that LPD argues is made more serious by the express order in the Administrative Leave directive. It is not readily apparent that acceptance of free rent runs afoul of the order not to engage in police action, and given the ambiguity of this, Hewitt's acceptance of rent does not equate to a "willful or deliberate" violation of the rules as referenced in PPM 261-2, recited in the memo. Neither does his telling the

45

manager to call 911, or asking kids to get out of the pool until police arrived, amount to overt police action. Hewitt was not in uniform, he did not identify himself to the juveniles as a police officer; and as he says, did no more than what any responsible adult would do. His instruction to the manager to call 911, which he did, was the appropriate thing for Hewitt to do and demonstrates his intention to adhere to the directives in the memo.

The same is true as to the allegations surrounding the infraction based on "personal documents" and objectionable images found on Hewitt's LPD computer. The record shows Steve Bergeron (Bergeron) conducted a search for LPD of Hewitt's LPD Laptop computer and he reported that: "[He] completed a search of Officer Hewitt's LCG email account inclusive of his inbox, deleted items, personal folders and sent items whereby no personal emails were observed." This would indicate that Hewitt was not routinely using his laptop at work for personal use. Bergeron further reported:

> He did find items located on Hewitt's home drive which included a selfie photo of a nude female with tattooed wings on her shoulder blades; an (sic) web article "AK47 Full Auto Conversion of Dummies" by Royi Eltink, a 21 year old computer programmer; what appeared to be an on-line information service querry on April Elizabeth Labbe; a document regarding a Bay Self Serve Carwash Bank Short Sale ; on-line order for a book; word document Letter to Denzel Washington; and two saved Louisiana Criminal History searches for Sharon Green and Jeffery Singleton.

It is these five "documents" which form the basis of one of the twelve infractions relied upon to terminate Hewitt's employment. The evidence shows that two of these documents were actually background checks on suspects conducted by Hewitt. The document regarding Ak-47 firearms was shown to be connected to weapons training. Another document was identified as a draft of a letter addressed to the actor Denzel Washington which Hewitt explained in his uncontradicted testimony as something he drafted during a class conducted by the

46

LPD instructing officers on better writing.  Only one "document" had nothing to do with Hewitt's employment duties.  According to Hewitt's uncontradicted testimony this "document" was a photo sent by email to Hewitt from a personal female friend as a joke.  The document is a photo of the person's new tattoo and depicts her bare backside showing the tattoo across her back.  Hewitt admits he opened the email not knowing what it contained and did not realize it was saved to the home drive.  While this is technically inappropriate personal use of his LPD computer it is not worthy of termination according to LPD's rules.  Under LPD's rules this is defined as a level one, minor offense, which the rule instructs merits minor disciplinary action and oral instruction admonishing the employee that this constitutes inappropriate use of his assigned computer.

LPD also made much of eleven misdemeanor summons and written statements allegedly found in Hewitt's police unit dating back to 2008.  As I have recounted above, and the majority acknowledges, when Hewitt was placed on administrative leave he was not allowed to return to his police unit.  It was kept at headquarters and apparently no one from LPD made any effort to examine the unit for several months.  After having the unit in its possession for quite some time LPD claims it found the summonses and witness statements in Hewitt's unit.  Hewitt explained that these documents were copies of items already submitted as it was his habit to keep such duplicates for his reference.  Others he explained as documents which should not have been initially issued as he concluded upon investigating the matters that there was no evidence any crime had been committed.  He was not required to turn in such documents.  Moreover, Hewitt testified without contradiction that his sergeant would always check his unit on a regular basis before he was placed on leave and he mentioned nothing about finding such documents or tickets in the unit which should have been turned in.

He also testified without contradiction that LPD routinely sent email notifications concerning missing documentation but none had previously been sent to him. In the course of nearly six years working for the LPD Hewitt testified he wrote over four thousand misdemeanor summons, which are similar to a ticket, in addition to the numerous traffic tickets he wrote. Moreover, Hewitt and Sergeant Soileau testified that if any notification had been sent to Hewitt he would take care of any such problem. Once again, while this infraction is made to appear to present a serious infraction the evidence shows something much less. The evidence of this alleged infraction does not preponderate in favor of cause for termination under LPD's own disciplinary procedures, even when viewed at the top of the heap.

Another of the alleged infractions relates to the allegation that Hewitt failed to turn in an updated request form for off-duty work at Dillards. It is undisputed that Hewitt had always turned in such forms in the past when provided the form by the shift Sergeant. In fact Hewitt turned in a form in February of 2010 when he began work at Dillards but no updated form was found for July of 2010. Hewitt testified that if a form was given out by the shift commander he would always fill it out. That testimony was uncontradicted. Hewitt could not prove that he submitted an updated form as required in July 2010, and there was no testimony as to whether the shift commander passed out such forms in July for officers to file. While it was incumbent on Hewitt to file the update in July his failure must be viewed in light of normal procedures. Again, this is a first-time infraction of a minor offense worthy of minimal disciplinary action according to LPD's rules and is mitigated by the fact that Hewitt had filed a form initially as required and was accustomed to receiving a renewal form during shift meetings. I repeat here, too, that **on July 30, 2010, Hewitt was described by Chief Craft in a written commendation as "an asset to [the] department and his squad, as well as the**

48

**community."** Such a contemporary commendation contradicts the notion that Hewitt's failure in July 2010 to file a renewal notice of his continuing off-duty employment with Dillards should result in termination of his employment. It speaks volumes as to what is really afoot.

When Chief Craft testified at the hearing before the Board concerning his termination of Hewitt he testified he based his decision to terminate Hewitt's employment "based on the number of complaints and the fact that this would be his third time to receive discipline. . ." The majority finds this assertion compelling. None of the twelve alleged infractions are a repeat of the three matters for which he was earlier disciplined. Chief Craft's testimony demonstrates there was no progressive discipline regarding any of the twelve alleged infractions, though Chief Craft, and the majority, acknowledge that such is in fact the policy of LPD. The attorney representing LPD asked Chief Craft if the termination was done in good faith and he responded "Yes" and "And was it done for cause?" to which he responded "Yes." But the determination of good faith and cause does not rest upon Chief Craft's assessment of LPD's actions.

Finally, in both its brief to this court, as it did before the Board, LPD makes much effort to paint Hewitt as a mentally unstable, dishonest, angry person of dubious character. LPD writes in its brief to this court: "Hewitt owed a duty to his superiors at the LPD, to the general public, and to the Lafayette City-Parish Consolidated Government to embody trustworthiness and high ethical character. His actions, however, demonstrate the antithesis of such values. Hewitt deserved termination." But my review of the record does not support this characterization which **is at odds with Dr. Latour's professional opinion after his analysis of Hewitt. It is at odds with Rostow's opinion of Hewitt. It is at odds with his previous law enforcement superiors in all of his jobs prior to joining the LPD.**

49

**And, it is at odds with LPD's, including Chief Craft's, multiple documented characterizations of Hewitt as a model officer and asset to the force in the years preceding his public comments accusing the LPD of a "code of silence" and retaliation. LPD did not act in good faith in terminating Hewitt because it acted "arbitrarily, capriciously, [and] as the result of prejudice or political expediency,"** *Moore***, 839 So.2d at 945-46**, i.e. I am satisfied the record in this case manifestly supports finding that LPD created a false picture of Hewitt and heaped a pile of individually low-level accusations upon him to bury what he and fifteen other brave souls sought to expose.

For the reasons stated I believe the Board acted arbitrarily and capriciously in upholding LPD's termination of Hewitt and I respectfully dissent from the majority's holding to the contrary.

**Cooks, J., dissents.**

If the majority's opinion stands the lesson learned here for all whistleblowers will be "never tell." Uletom Hewitt's (Hewitt) travails as a police officer did not start until he tried to make public what he and others allege was the illicit "code of silence" of the Lafayette Police department of longstanding. As we all know, no one is perfect on the job thus making all who dare to speak out vulnerable to character annihilation.

The majority makes brief reference to Hewitt's career as a police officer and sums up his career in short shrift: "Hewitt's supervisors, superior officers, and LPD Chief Jim Craft praised Hewitt on many occasions." From this complimentary introduction, the majority launches its review of Hewitt's last actions which the two conclude merits his discharge. Like the LPD, the majority paints the picture of an officer unworthy of rehabilitation as an employee and

50

utterly unworthy to serve as a police officer. My thorough review of the record illuminates a very different picture of Hewitt and of the behavior of LPD.

Hewitt worked as a police officer for the Lafayette Police Department (LPD) from 2006 to August 30, 2011. He received his BA degree in criminal justice from the University of Louisiana at Monroe in 2000. Hewitt was an experienced law enforcement officer before joining the LPD. Prior to joining LPD, Hewitt worked as a police officer for the Grambling Police Department for roughly one year and as a deputy for the Ouchita Parish Sheriff's Office for approximately five years. During the six years prior to that he worked for the Lincoln Parish Detention Center and Richwood Correctional Center. Chief Tommy Clark, Grambling Police Department, "spoke very highly of Officer Hewitt." Chief Clark remarked that "Officer Hewitt has excellent work habits, has only used twelve hours of sick leave while with the department, and is always willing to fill in even on short notice." He further stated he "hate[d] to lose Officer Hewitt but understands when a person wants to better themselves." When asked for his opinion regarding why Officer Hewitt has had several different jobs in law enforcement, Chief Clark responded that "he believed it to be a process of advancement and not due to any negative reasons." He further explained Officer Hewitt joined the Grambling Police Department because Chief Clark offered him a job after meeting him at the Lincoln Parish Detention Center. Warden Goree of the Lincoln Parish Detention Center "also spoke very highly of Officer Hewitt." She described him as "very disciplined, punctual, communicates well with others, follows instructions, and very professional." She expressed that she too "was not happy with losing Officer Hewitt as an employee but wished him well in his career."

Indeed, as the majority admits, Hewitt also enjoyed a commendable record with LPD for several years. A review of his employee evaluations made part of

51

this record reflect Hewitt received multiple commendations and was heralded as a dedicated police officer. According to these evaluations and letters of commendation Hewitt was described by Chief of Police Jim Craft (Chief Craft) as "a model police officer." Hewitt's supervisors, superior officers, and Chief Craft praised Hewitt in writing on many occasions as follows: (1) On August 1, 2007 Chief Craft wrote he was "proud to have [Hewitt]on our team" describing him as "an ideal model for other officers;" (2) on August 31, 2007, Hewitt was singled out among a group of officers who received commendation for their efforts in a suicide situation "Hewitt did excellent work at the residence . . . The objective was accomplished in locating Steven before he hurt himself and seeing that he get medical attention;" (3) on October 26, 2007 Chief Craft commended Hewitt in writing "for handling [a difficult criminal matter] in such a professional and efficient manner;"[4] (4) on April 21, 2008 Chief Craft again issued a written commendation to Hewitt stating "I want to thank you for performing your duties in such a professional and compassionate way as to have [a citizen] give me a call and write to commend you;" (5) and again on July 30, 2010, Hewitt was described as "an asset to [the] department and his squad, as well as the community."

At some point in time between this 2010 commendation and the spring of 2012, Hewitt and fifteen other officers of the LPD, many of whom were long-term employees, engaged in public discussions alleging corruption and the existence of what they described as a "code of silence" within the LPD. These officers asserted that the LPD retaliated against them for refusing to participate in practices they

---

[4] This commendation arose out of a situation in which Hewitt became involved in pursuing a criminal matter at Lafayette General Hospital when the first two officers assigned failed to handle the situation because their shift ended. Hewitt spent the better part of a day tracking down the suspected criminal who had assaulted a woman and managed to make an arrest before more harm was done to the victim. He pursued the matter vigorously, even going outside his assigned precinct and working long after his shift ended. After apprehending the perpetrator he voluntarily worked late to handle the booking procedure personally. His handling of the matter earned him high praise and a written commendation.

considered improper and for exposing the alleged "code of silence."  Eventually

they sought certain relief in state court.  Finding those efforts unsuccessful, in early

2012, Hewitt along with fifteen fellow LPD officers filed suit in United States

District Court for the Western District of Louisiana against the LPD and several

individual defendants, including Chief Craft and Major Alfred, as well as Lafayette

Consolidated Government.[5]

Following the glowing July 2010 commendation, and before the filing of the

federal lawsuit in 2012, matters took a decidedly bad turn for Hewitt with the LPD.

As the majority chronicles, Hewitt was suspended for five days without pay on

March 3, 2011, based on the finding at a pre-determination hearing "that Mr.

Hewitt disobeyed a direct order from a superior officer, Sergeant Starring, which

caused panic and chaos, which unnecessarily alarmed the public."  *Hewitt v. City

of Lafayette*, 15-912, p. 3 (La. App. 3 Cir. 3/2/16), 186 So.3d 357, 359.  Hewitt

appealed the determination to the Board.  On January 14, 2015, the Board upheld

the decision and punishment as did the Fifteenth Judicial District Court and this

court.  *See Hewitt*, 186 So. 3d at 361.

On March 2, 2011, Hewitt was accused of failing to properly use his in-dash

camera system in his police cruiser.  A pre-determination hearing was held on this

complaint and on August 8, 2011, Hewitt was suspended for seven days without

---

[5] The ongoing dispute between the plaintiffs and defendants has been the subject of extensive media coverage with multiple extra-judicial comments being made in the print and television media. The extensive media coverage began in the spring of 2012 even before the initial judicial proceeding, which was a hearing in the 15th Judicial District Court for the Parish of Lafayette. In that proceeding the plaintiffs sought a temporary restraining order and injunction against the Lafayette Parish Consolidated Government. The TRO was denied, and the petition was dismissed with prejudice on May 29, 2012.[3] This suit followed on June 5.

*Marceaux v. Lafayette City-Par. Consol. Gov't*, 12-1532, 2012 WL 4194521, p. 2 (W.D. La. Sept. 19, 2012), *vacated in part*, 731 F.3d 488 (5th Cir.2013).

pay. Hewitt appealed his suspension to the Board but it refused to hear the appeal on the basis that the suit pending in federal court precluded it from hearing Hewitt's appeal. In *Hewitt v. Lafayette Municipal Fire & Police Civil Service Board*, 13-1429 p. 10 (La.App. 3 Cir. 6/4/14), 139 So. 3d 1213, 1221, this court found the Lafayette Municipal Fire & Civil Service Board (Board) was "without legal cause to refuse to set hearings on Hewitt's appeals pursuant to La.R.S. 33:2501(A)." Consequently, this court held "**the Board failed to act in good faith and for just cause when it denied Hewitt a hearing on his appeals**." *Id*. (emphasis added) We further found the Board's refusal to conduct a hearing on Hewitt's appeals was "an arbitrary and capricious abuse of discretion." *Supra.* at 1224. The case was remanded to the district court "with an order to issue the writ of mandamus" ordering the Board to hear Hewitt's appeal. Hearings on Hewitt's appeal to the Board were held on January 14, 2015, eight months after this court's ruling, at which time the Board upheld the suspension. Hewitt appealed to the district court and it upheld the Board's decision. This court affirmed the trial court ruling. *Hewitt*, 186 So.3d at 347. It could not be foreseen by this court at that time just how telling this initial capricious behavior of the Board would be regarding what was in store for Hewitt.

On March 25, 2011, Hewitt was placed on paid administrative leave pending a fit-for-duty exam. According to Hewitt he informed Dillards on that date that he was placed on administrative leave and thus ineligible to work off-duty detail. According to Hewitt's uncontradicted testimony, and written statements made part of the record, Dillards did not want to lose Hewitt as an employee, but under their employment policy they could not keep his position open for an undetermined amount of time. As Hewitt could not say how long his administrative leave would last Dillards had no choice but to terminate his employment. Further, according to

54

Hewitt, Dillards invited him to apply for his job after the administrative leave was over. The majority notes LPD refers to documents placed in evidence at the hearing that indicate Dillards fired Hewitt for time clock issues and LPD made this accusation one of the alleged infractions deserving of termination. **It fails to note that no witness was called regarding any of the issues relating to Dillards and that the documents are not corroborated nor authenticated by any testimony from persons representing Dillards.**

While on security duty at Dillards prior to his termination, Hewitt believed he saw evidence of a bomb threat and sprang into action to evacuate patrons. As mentioned earlier, he was ultimately disciplined by LPD for his over-exuberant handling of the matter and this court affirmed his seven-day suspension which resulted from this incident. At the time it rendered that opinion this court was unaware of the details now before us. There is nothing in this record to show that Dillards was displeased with Hewitt's handling of this incident nor did Dillards fire him as a consequence of his handling of that incident. In fact, documents in this record reflect he handled the situation inside Dillards well and to their satisfaction, but it was LPD's view that his alleged overstepping and rush to evacuate patrons potentially in harm's way served as cause for disciplinary action.[6]

After disciplining him for failing to adhere to his supervisor's instruction to cease the manner in which he was handling the matter with mall patrons, LPD placed Hewitt on administrative leave with pay pending a fit-for-duty examination. As the majority states:

> According to Hewitt, when he arrived for his shift duty at LPD he was told that he was placed on administrative leave effective immediately and that he would be informed later as to the reason therefor. He was required to surrender his weapon, taser, and summons book. He was not allowed to go to his police unit which

---

[6] *See Hewitt v. City of Lafayette*, 15-912 (La.App. 3 Cir. 3/2/16), 186 So.3d 357.

was secured at LPD headquarters. He was instructed in very certain terms that **he was not to call, email, text or in any manner make any form of contact with the LPD or anyone at LPD until further notice.** He fully cooperated and acted professionally in the circumstances. When he indicated he was leaving to walk home the officers said they would give him a ride home. He initially refused their offer and said he would rather just walk. The officers in charge expressed their concern that it would not look good for a uniformed police officer to be seen walking home. Hewitt acquiesced [to their demands].

Chief Craft subsequently required Hewitt to submit to a fit-for-duty examination. Hewitt complied and reported to the Psychiatrist as instructed.

Dr. Thomas G. Latour, M.D. Psychiatrist (Dr. Latour) was assigned to evaluate Hewitt. Lafayette City/Parish Nurse, Kim Bare (Bare), the person in charge of referrals for such evaluations, normally referred employees to Dr. Latour. Upon completing the evaluation, Dr. Latour wrote in large lettering on the evaluation form "**I feel he is fit for duty.**" (emphasis added) On the same form Dr. Latour wrote the following (emphasis added):

> MENTAL HALTH EXAMINATION: The patient is a casually groomed black male who appears to be in no acute distress. *He relates well to the interviewer.* His mood is one of depression and his affect is blunted. His speech is normal. He is oriented as to time, person, place and situation. His thought processes are intact without any looseness of associations. He denies having hallucinations. He is neither paranoid nor delusional. His memory is intact for recent and remote events. His intellectual functioning is considered to be fair and he has a good general fund of knowledge. . ."

The last sentence in this recitation was marked through by Dr. Latour, it read: "His judgment and insight are considered to be poor." Dr. Latour scratched through this comment by hand, drew an arrow from the scratched through comment to the bottom of the page, and wrote: "I do not agree with this statement." He then signed his name after the special notation. This signature is an obvious match to Dr. Latour's signature on the evaluation and an attached letter, an observation acknowledged by Chief Craft in his testimony before the Board.

56

The majority notes: "The marks on the document may indicate that Dr. Latour did not agree with the assessment that Hewitt had poor judgment and insight, but it certainly raised the question of why he signed the form in the first place with the notation that Hewitt's judgment and insight are poor." This, says the majority, supports Chief Craft's conclusion that he could not "rely upon Dr. Latour's assessment." **The marks on the document clearly indicate *Dr. Latour did not agree with the assessment that Hewitt had poor judgment and insight*. It is also very clear, as Dr. Latour wrote in very large letters, he concluded Hewitt was "fit for duty."**

Chief Craft nevertheless ordered Hewitt to submit to another assessment by a firm in Baton Rouge, known as Matrix, Inc. (Matrix). Chief Craft reached this conclusion despite the fact that Dr. Latour had also put his finding in a typed letter to Bare. In that letter, dated April 11, 2011, the same date as the signed evaluation form, Dr. Latour wrote: "After reviewing all materials provided to me and after evaluating Mr. Uletom Hewitt, *it is my professional opinion* that Mr. Hewitt is mentally fit for duty and is able to return to work." (Emphasis added) Dr. Latour included the telephone number where he could be reached for any questions concerning his evaluation.

After being instructed to report to Matrix for a second fit-for-duty evaluation, Hewitt was transported to Baton Rouge on June 21, 2011, in a police unit accompanied by two officers, to the facility where he was subjected to a barrage of some five hundred (500) questions for the better part of a day, without even a break for lunch. No explanation has ever been offered as to why Hewitt was not allowed to travel on his own to Matrix just as he had previously reported to Dr. Latour on his own. It is noteworthy that the second evaluation scheduled at Matrix was performed by a less credentialed expert than Dr. Latour. Cary D.

Rostow, Ph.D., M.P., Clinical Psychologist (Rostow) conducted the fit-for-duty

evaluation at Matrix.  He noted in his written report:

> **"Officer Hewitt generally complied with the evaluation process**, although he complained that he had already been "cleared" by another doctor and did not see the purpose.  **He did not refuse or attempt to refuse to submit to the examination.  Officer Hewitt did not seek to change or alter the evaluation procedure.**

> . . .

> **Officer Hewitt understood and agreed to all conditions of the evaluation before it took place.** (Emphasis original)  "When asked why the department sent him for this evaluation, Officer Hewitt wrote: 'I really don't know why I'm here.  The Chief suspended me for five days for a(sic) incident which occurred on December 21, 2010.  (The evaluation took place on 6/21/11.)  I'm currently try [sic] to get Civil Service to hear my side of the story in that matter with my lawyer.  I really do not know why I'm here but I have to comply with what they ask.  I was seen by another doctor before and he said I was Fit for Duty."

In his written "recommendations" Rostow further stated:

> The following recommendations are based upon existing information, test data, interview information and what is believed to be the standards of police conduct and behavior expected in the department.  It is not meant to be used alone, but can be a useful adjunct to decision making when combined with other information taken from administrative, supervisory and other sources[.]

> Officer Hewitt has not complied with the requirements of the FFDE to a degree necessary for the examiner to come to a conclusion regarding his Fitness for Duty.

> . . .

> Officer Hewitt was in denial of responsibility for all possible errors or mistakes regarding any observed difficulties documented by his department.  He did not seem aware of the possibility that any actions of his could be questionable or may have caused others to be critical of his conduct.  The problem, in his view, always resided with the behavior or actions of others.  This denial pattern continued in psychometric testing which was invalid due to the denial of universal minor faults that are noted in healthy and impaired persons.  Therefore, no statements may be made regarding his current Fitness for Duty. (Emphasis original)

The majority acknowledges that: "In an interview on July 11, 2011, conducted by LPD Internal Affairs' Detective Shawn Terro and Sergeant Keith Gremillion, Rostow reiterated that Hewitt "answered questions. He did not refuse. He did not tell me it was none of my business or he wouldn't talk to me about it." He further stated '**That's full compliance with the interview. He complied with the interview.**' Ultimately, Rostow did not render any opinion as to Hewitt's fitness for duty. . ." (Emphasis added) Although he was interviewed at length Rostow was not called as a witness at the Board hearing to explain his comments and observations. Dr. Latour could not be called as a witness because he died before the hearing, therefore his letter and written evaluation were entered in evidence. As an M.D. Psychiatrist he clearly found after examining Hewitt in his "professional opinion" he was fit for duty. Allegedly, when he was asked to explain the scratch out he simply replied he had nothing more to add.

Hewitt was never returned to duty. Instead, he was kept on paid administrative leave and then informed that he was going to be terminated for twelve alleged infractions, set forth in the majority opinion, most of which are alleged to have occurred while Hewitt was on administrative leave. A review of these alleged infractions reveals that under LPD's internal rules ten of the alleged twelve infractions are Category 1 offenses, defined in LPD's Rules as "minor offenses," and two may be Category three offenses, the most serious category.

Hewitt was terminated on August 30, 2011, and although he timely appealed his termination the appeal was not heard until July 8, 2015. As noted, the Board had refused to hear Hewitt's appeals awaiting disposition of the case pending in federal district court. The Board upheld Hewitt's termination with one dissenting vote in his favor. He timely appealed the Board's decision to the Fifteenth Judicial District Court which appeal was heard on September 19, 2016. The district court

59

signed the judgment on October 17, 2016, upholding Hewitt's termination. He timely filed the present appeal alleging five assignments of error detailed by the majority.

It is undisputed in this case that Hewitt was a tenured civil servant when he was terminated from his employment with the LPD. The majority acknowledges that under Louisiana Constitution Article I § 2, Hewitt's status as a tenured or classified civil servant constitutes a property right which cannot be taken from him without due process of law:

> The Due Process Clause provides that the right to life, liberty and property cannot be deprived except pursuant to constitutionally adequate procedures. U.S. Const. amend. XIV; La. Const. Ann. art. X, § 8(A). A due process claim in the context of civil service employment depends upon an employee having a property right in continued comparable employment. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Tenured or classified civil service status is a property right and cannot be taken away without due process. *See* La. Const. Ann. art. I, § 2; *Wilson v. Jefferson Parish,* 95–470 (La.App. 5 Cir. 1/17/96), 668 So.2d 1167, *writ denied,* 96–413 (La.4/19/96), 671 So.2d 927; *Bell v. Department of Health and Human Resources,* 483 So.2d 945 (La.1986), *cert. denied,* 479 U.S. 827, 107 S.Ct. 105, 93 L.Ed.2d 55 (1986).
>
> . . . .
>
> Due process is a flexible standard and calls for such procedural protections as the particular situation demands. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). As the United States Supreme Court noted in *Loudermill,* "**the right to due process is conferred not by legislative grace, but by constitutional guarantee**." *Loudermill,* 470 U.S. at 541, 105 S.Ct. 1487 (quoting *Arnett v. Kennedy,* 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)). Although a state may establish certain statutory procedural safeguards to protect property rights, the safeguards may still be judged insufficient (depending on the facts and circumstances of a particular case) to guard the particular property interest at risk. *Loudermill,* 470 U.S. at 541, 105 S.Ct. 1487.
>
> '[The] central meaning of procedural due process is well settled. **Persons whose rights may be affected are entitled to be heard; and in order that they may enjoy that right, they must first be notified.**' *Wilson v. City of New Orleans,* 479 So.2d 891, 894 (La.1985). Correlatively, this right to notice and opportunity to be

heard must be extended at a meaningful time and in a meaningful manner. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Armstrong v. Manzo,* 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).

*Moore v. Ware*, 01-3341, pp. 11-13 (La. 2/25/03), 839 So.2d 940, 948–49 (emphasis added).

The most serious accusations lodged against Hewitt focus on his alleged "untruthfulness" during an administrative investigation. If proved by LPD his untruthfullness would amount to gross insubordination and would provide just cause for termination. But, allegations of untruthfulness raised here cannot form the basis for Hewitt's termination for two reasons. First, Hewitt did not receive prior notice of the alleged untruthfulness infractions prior to the pre-determination hearings in which he had a right to know all charges against him so that he might prepare a defense. The majority admits the state constitution requires adequate notice. In complaint AD2011-011 there was no mention of "untruthfulness violations" or the basis therefor in either the memorandum from Chief Craft to Hewitt or in the notice of the hearing sent from Major Randy Vincent. Likewise, in complaint AD2011-12 Chief Craft's memorandum to Hewitt notifying him of three combined investigations did not mention untruthfulness infractions nor did Major Ned Ewing mention such infractions in his notice to Hewitt of the pre-disciplinary hearing. Additionally, neither Chief Craft nor Major Ewing mentioned in either of their memos to Hewitt regarding complaint Ad 2011-012 anything about the allegations regarding his termination from Dillards or his failure to provide an updated off-duty request form for Dillard's. Hewitt had no notice prior to the pre-determination hearings of these alleged infractions and was not given any explanation of the evidence LPD intended to use to prove these allegations. Nevertheless, the majority erroneously concludes Hewitt was

adequately put on notice as to allegations contained in AD2011-012 ("that Hewitt failed to comply with or gave false information to Dr. Rostow"). I disagree for the reasons stated herein. The majority does admit, and finds that the allegations concerning the Dillard's time clock issues cannot be used to discipline Hewitt because of the failure to give adequate notice. I agree with that finding for the same reason as the majority and for additional reasons discussed herein.

The second reason I reject these allegations as a valid basis for termination of Hewitt's employment is that even if Hewitt had received notice of these alleged infractions they would not amount to an untruthfulness violation as I read the applicable employment rules of the LPD and Lafayette Consolidated Government (LCG). Concerning the untruthfulness allegations based on Hewitt's responses to Rostow, I believe his responses cannot be classified as deliberately "untruthful" as that term is used in the LPD rules. Rule 1.20 requires LPD employees to "cooperate and assist in any work-related administrative investigation and to answer any related questions completely and truthfully." Rule 2.14 prohibits any "*Deliberate falsification* of any form, record or report." (Emphasis added) The evidence does not show that Hewitt violated either of these rules. Both Dr. Latour and Rostow confirm that Hewitt willingly cooperated and assisted them in the fit-for-duty examinations and there is no evidence that Hewitt deliberately falsified any information on any form or report. Hewitt was told before he was interrogated by Rostow that information obtained by the examiner would not be used for criminal investigation (self-incrimination) purposes, and that he was free to leave or refuse to answer questions but must tell the truth in all answers that he submits. Rostow stated in his report: "**Officer Hewitt understood and agreed to all conditions of the evaluation before it took place.**" (Emphasis in original) Rostow was not called to testify at the hearing to offer an explanation of what he

62

meant when he reported that Hewitt was not "truthful" in the interview for the fit-for-duty examination. The written documents entered in evidence provide insight into his meaning. Included in the record is a transcript of an Internal Affairs Interview of Rostow after he submitted his written report. **Significantly, Rostow *does not maintain Hewitt intentionally fabricated* his responses.** Rostow says in the interview that he describes Hewitt as being "untruthful" to him in testing because: "He gave me a history that is *inconsistent . . . with the history I received from official documentation*" (emphasis added). In further explaining Hewitt's responses to the information provided to Rostow by LPD he says he cannot say that Hewitt has any mental illness:

> It's not an illness. It's an attitude. It's a belief system. He brought it to the department and probably he had it in another department earlier. It's a guess, but I suspect this is the case and now you have to cope with it. So, what can be done to make him different? I don't know of anything. I don't know.

Rostow summed up his assessment of Hewitt in that interview (emphasis added):

> *So, his idea is that he's doing what's right. He is doing what his understanding of his profession is.* Everybody else is a little bit off, a little bit too relaxed on the rules or somehow have the rules wrong and he is the standard by which others should judge him. That's his attitude. It's not an illness. *I got a school of people like that. They're successful psychologist. (sic)* **It's not an illness.** But, it is very hard to live with in a paramilitary organization where you're expected to take and obey orders.

Nothing in Rostow's remarks equates to deliberate or intentional "untruthfulness" of the sort proscribed by the LPD rules which would amount to insubordination. As Rostow points out, *Hewitt was not fabricating* his responses. He answered the questions truthfully in accordance with what he earnestly believed to be the truth. It must be remembered that Hewitt has long maintained that the LPD operates under a code of silence and engages in corrupt practices and

63

retaliation against employees who do not go along with the program. As I have already stated, his belief in these accusations was so strong that he joined fifteen other officers who alleged the same thing in a suit filed in federal district court. Hewitt was dismissed from the suit on the basis of prescription. Contrary to the majority's assertion, no court to date has determined the "truthfulness" of those allegations on the merits.

The majority attempts to bolster its finding on mere *obiter dicta* in the federal district court's ruling on the exception of prescription raised as grounds to dismiss Hewitt as a plaintiff in the matter. LPD asserted before the Board, and again argues in this court, that the federal district court in *Marceaux v. Lafayette Parish Consolidated Gov't*, 2014 WL 4817935 (W.D. La. Aug. 8, 2014), 614 F.App'x 705 (5th Cir. 2015) made a finding of fact that Hewitt engaged in prohibited conduct which justified his termination of employment. LPD has often pointed to statements by Judge Haik in the federal case as an adjudication of the issues but that is not so. Any of the judge's pontifications were dicta. The only issue before the federal court upon which it rendered judgment as to Hewitt was the issue of prescription. The court did not conduct a trial on the merits in ruling on the exception of prescription. In *Alpine Meadows, L.C. v. Winkler*, 49,490 p. 12 (La.App. 2 Cir. 12/10/14), 154 So.3d 747, 757, *writ denied*, 15-0292 (La. 4/24/15), 169 So.3d 357 the court found:

> In addressing that matter, which was **not** essential to our review of the summary judgment, this court rendered an advisory **opinion** that must be considered as purely *obiter **dicta*** and **not** binding on either the lower court or this court. *Meaux v. Wendy's Intern., Inc.,* 2010–2613 (La.5/13/11), 69 So.3d 412 . . .

In *Thomas v. K-Mart Corp.,* 525 So.2d 24, 29 (La.App. 3 Cir. 1988), *writ denied*, 525 So.2d 1045 (La.1988), and *writ denied*, 525 So.2d 1045 (La.1988) the court held that the trial judge's statement in his reasons for judgment that "he

considered the testimony of Dr. McDaniel to be 'more accurate and correct than Dr. Blanda'" *Thomas*, 525 So.2d at. 29, **was obiter dicta and could not be considered "a finding"** ***Id.*, by the trial court**. *Likewise, the federal trial judge's statements in his reasons for judgment concerning the cause(s) for terminating Hewitt's employment are not findings of fact, as LPD and the majority insists, and* ***carry no precedential value***. Judge Haik's dicta cannot be used to bolster LPD's argument or the majority's findings.

Hewitt complied with Rule 1.20 in the fit-for-duty examination conducted by Rostow according to Hewitt's testimony, Rostow's reports, and the interview by LPD investigators. Rostow's report and interview reflect his admissions that Hewitt *cooperated and assisted* with that examination and answered over 500 written and oral questions for the better part of a day. He answered Rostow's questions completely and in accordance with his personal take on the circumstances he was asked about. The fact that Hewitt refused to agree with the LPD's version of events or agree to their correctness, which he openly disputed, does not make him "untruthful" and does not amount to a willful violation of Rule 1.20.

LPD included in the twelve alleged infractions one concerning time clock issues at Dillards and introduced documents from Dillards purporting to show that Dillards terminated Hewitt for cause based on falsifying time clock entries. The purported Dillards' documents were sent to LPD via facsimile transmission dated August 8, 2011, consisting of five pages including the facsimile cover sheet. The majority finds, and I agree, that Hewitt did not receive proper prior notice of this accusation and thus it cannot be used as a basis for disciplinary action. But, for the sake of completeness, I point out that even if he had received proper notice this alleged infraction is unsupported by the record. According to Hewitt's

uncontradicted testimony he did not know about this issue with Dillards prior to the hearing. His testimony is corroborated by the fact that the "Separation Data Form" from Dillards recites that Hewitt was "unavailable for signature" and that notation is dated March 25, 2011. Hewitt testified he informed Dillards on March 25, 2011, of his administrative leave and the fact that such made him unable to continue his off-duty assignment at Dillards. Although there was a forwarding address for Hewitt on the form it is blacked out. This form contains language requiring that an employee receive a copy of the form allowing the employee the opportunity to comment on the matter addressed in the form. But this requirement was not met and Hewitt was accorded no opportunity to respond to these allegations. The next page contains a "Statement of Action Taken," which sets forth the purported reason for Hewitt's termination and recites March 24, 2011 as his last day of employment. This document is followed by another page which contains the signature of a person identified as an assistant store manager for Dillards, Joshua Koenig, and it is dated February 2, 2011. Such would indicate that the "action taken," i.e. termination of Hewitt's employment, occurred on February 2, 2011, and yet the previous page indicates it occurred on March 24, 2011, and indicates the form memorializing this was "completed" on March 25, 2011, curiously the same date Hewitt was placed on administrative leave. This page also provides for comments by the employee and a place for the employee's signature and date, all of which are blank. The last page attached by Dillards to its facsimile transmission shows a list of dates and times clocked in and out but nothing on that page evidences who these dates and times relate to and do not, standing alone, offer any proof of the alleged reason for Hewitt's termination from Dillards. Thus, Hewitt's testimony regarding his termination from Dillards stands

66

uncontradicted and LPD's version is not supported by properly authenticated documents or any sworn testimony from any representative of Dillards.

Hewitt's explanation of why Dillards terminated his off-duty employment also does not equate to Hewitt violating the untruthful provisions of the LPD rules. Hewitt's uncontradicted testimony about his termination from Dillards offers a different explanation for the termination than the unsupported and confusing employment documents relied on by LPD. LPD was in possession of the documents as of August 8, 2011 but no one was called as a witness from Dillards. Hewitt offered the only testimony concerning the matter. He testified that, in compliance with LPD rules, he immediately informed Dillards about his administrative leave and that such prohibited his continued off-duty service there. Nothing contradicts that testimony. According to Hewitt, Dillards wanted him to return to work as soon as the administrative leave ended. The facts accord some measure of credibility to Hewitt's account given that in the previous incident involving Dillards and the mall, despite that LPD disciplined Hewitt for his handling of mall patrons, **Dillards was not displeased with his handling of their customers and continued his employment after that episode.** Moreover, Hewitt offered in his uncontradicted testimony a plausible explanation for the discrepancies in the time clock entries. According to his testimony Hewitt would have reason to leave the store through exits other than where the time clock was located in fulfilling his duties and re-enter the same way. This occurred when he followed patrons out of the store to ensure their safety in the parking lot or to observe suspicious activity in the parking lot. According to his testimony the time clock door was observed by a camera operator who would not allow anyone to exit there without clocking out. Thus, any time Hewitt used that exit he clocked in and out. Nothing was offered to dispute Hewitt's testimony except for the four-page

67

document allegedly generated by Dillards. That document was never authenticated and it contains internally inconsistent information. No witnesses were called to present Dillards' side of the story. Further, it is difficult to imagine how this internal dispute at Dillards could be said to have a substantial impact on the operations of the LPD. No evidence was put forward by LPD to show how this issue substantially impaired the efficient operations of the LPD. It appears to have been just adding to the pile for effect.

Hewitt's uncontradicted statement as to what precipitated his termination of employment at Dillards is not intentional dishonesty and does not equate to being untruthful as proscribed in LPD's rules. Additionally, I reiterate, LPD does not dispute that Hewitt complied with Rule 1.20 in the fit-for-duty examination conducted by Dr. Latour who concluded without reservation, after considering all of the information provided him by LPD and Hewitt, that Hewitt was fit for duty and could be returned to work. For these reasons I believe the allegations of insubordination based on untruthfulness could not be considered, and even if they could have been addressed LPD failed to meet its burden to prove Hewitt violated its rules on truthfulness.

As the majority recognizes, LPD's rules for disciplinary action are based on the stated philosophy "that discipline be utilized in a progressive and positive manner." Policy Procedure No.: GO-204.5. LPD is specifically directed as follows: "**Discipline shall not be administered as punishment, but instead as a tool used in guiding the employee into being productive and accountable for their actions or inactions**" (Emphasis added). Although the majority includes these policies in its opinion I repeat them here with emphasis on the language I believe is vitally important to a proper decision in this matter:

SUPERVISOR'S RESPONSIBILITY

68

**E.** Except for gross breaches of discipline, supervisors **shall attempt to begin employee discipline with the least punitive measures. If this fails to bring about positive change, then increasingly more severe measures may be required. While this process may take some time, supervisors shall ensure that each employee is dealt with justly, and in a manner which clearly indicates that positive, constructive measures utilized to change behavior or performance preceded the imposition of more negative sanctions.**

**F.** First-line supervisors are in the best position to observe employee appearance and conduct. They shall detect those instances where formal or informal actions are warranted. First-line supervisors shall counsel employees informally, for minor infractions such as tardiness, abuse of duty time, inadequate or unsatisfactory job performance, abusive language, or disruptive behavior. Severe acts and misbehavior shall be brought up the chain of command. These types of actions will result in a more severe penalty.

**The progression of discipline is counseling, remedial training, oral reprimand, letter of counseling, mandated counseling by E.A.P. or similar program.** Oral warnings are for minor infractions and are purged from employee record on first day after employee's annual evaluation. Letter of Counseling is final informal action and is served on employee "who is in violation of the rules, regulations, procedures, or policies of LPD. The purpose of the letter is to offer constructive criticism of an employee's behavior, action/inaction or appearance." "letters of counseling shall be purged one year from date of the incident."

Oral Reprimand can only be issued by Chief of LPCG. "At the time of an oral reprimand, the affected employee shall be counseled as to the correct behavior." Letter of reprimand can only be issued by Chief or LPCG. A letter of reprimand remains part of employee's record for not mre than 18 months. Demotion, suspension, reduction of pay. Chief or LPCG.

**Dismissals shall be made in cases of extreme malfeasance, misfeasance, or non-feasance of duty.** (Emphasis added)

The majority outlines the rules governing disciplinary actions for LPD and the three categories of offenses. **As I have previously noted, most of the alleged infractions which resulted in Hewitt's dismissal occurred while he was on administrative leave and the ten infractions which might form the basis for discipline are all Category One minor offenses.** *The majority ignores the important fact that there was no attempt by LPD to comply with the requirement to*

*progressively discipline Hewitt for any of the infractions which formed the alleged basis for his termination of employment.* None of the remaining ten alleged Category One minor offenses resulted in any counseling by a supervisor. There was no oral reprimand, no letter of counseling, no "mandated counseling by E.A.P." and no remedial training. LPD did not make any attempt to follow its own mandated guidelines and directives in dealing with the alleged infractions of Hewitt. Hewitt was placed on paid administrative leave ostensibly for a fit-for-duty exam, but when Dr. Latour pronounced him fit-for-duty he was not returned to work. Instead, he was sent to an out-of-town facility in Baton Rouge to be examined by a less qualified expert than Dr. Latour. After subjecting Hewitt to a lengthy and rigorous examination Rostow could not reach a conclusion. Still, Hewitt was not returned to work but was continued on paid leave and ultimately accused of a litany of minor offenses while on leave.

The statutory and jurisprudential law concerning dismissal of tenured civil servants like officer Hewitt requires that such actions be made for cause, **in good faith**, and must not be arbitrary or capricious. A proper appellate review must consider two determinations: "(1) whether the appointing authority had good or lawful cause for taking the disciplinary action, and (2) whether the punishment the appointing authority imposed is commensurate with the offense." *Abbott v. New Orleans Police Department*, 14-993, p. 8 (La.App. 4th Cir. 2/11/15), 165 So.3d 191, 197-98 and cases cited therein. Additionally, LPD must prove by a preponderance of evidence that the infractions of its rules complained of occurred and that the employees actions or inactions "bore a real and substantial relationship to the efficient operation" of the LPD. *Green v. New Orleans Recreation Development Comm'n.*, 16-1122, p. 17 (La.App. 4th Cir. 5/10/17), 220 So.3d 165, 176 and cases cited therein. The majority opinion fails to meet this standard.

The Louisiana State Supreme Court, in *Moore v. Ware*, 01-3341, p. 7 (La.2/25/03), 839 So.2d 940, 945-46 (emphasis added) set forth an appellate court's standard of review:

> An employee under classified service may appeal from any decision of the civil service board that is prejudicial to him. La.Rev.Stat. Ann. § 33:2501(E)(1). Such an appeal shall be taken to the district court wherein the civil service board is domiciled. *Id.* This hearing "shall be confined to the determination of whether the decision made by the board was made in good faith for cause" and "[n]o appeal shall be taken except upon these grounds." La.Rev.Stat. Ann. § 33:2501(E)(3).

> If made in good faith and statutory cause, a decision of the civil service board cannot be disturbed on judicial review. *Smith v. Municipal Fire & Police Civil Service Bd.,* 94-625 (La.App. 3 Cir. 11/02/94), 649 So.2d 566; *McDonald v. City of Shreveport,* 655 So.2d 588 (La.App. 2 Cir.1995). **Good faith does not occur if the appointing authority acted arbitrarily or capriciously, or as the result of prejudice or political expediency.** *Martin v. City of St. Martinville,* 321 So.2d 532 (La.App. 3 Cir.1975), *writ denied,* 325 So.2d 273 (La.1976). **Arbitrary or capricious means the lack of a rational basis for the action taken**. *Shields v. City of Shreveport,* 579 So.2d 961, 964 (La.1991); *Bicknell v. United States,* 422 F.2d 1055 (5 Cir.1970).

LPD's lack of good faith and capriciousness in its termination of Hewitt's employment is evidenced by several facts. First, as noted above, the utter and complete failure of LPD to make any attempt to follow its own dictates concerning progressive discipline especially for offenses defined by its own rules as "minor" Category One offenses. Second, the fact that, **despite its firm instruction to Hewitt not to contact the department or any department personnel by any means including telephone calling, texting, and/or email, LPD listed as cause for termination Hewitt's failure to contact LPD.** Hewitt was directly ordered when placed on administrative leave on March 25, 2011, in writing as follows:

> You are being placed on Administrative Leave, with pay, until further notice. This leave and its conditions are effective immediately.

**While on Administrative Leave, you must adhere to the following conditions**: (emphasis original)

    B. If the Officer is placed on administrative leave he shall remain available during regular business hours; Monday to Friday 8:00 a.m. to 5:00 p.m. and he shall be available for any of the following:

        4. Counseling sessions as mandated by the Department;

        5. As directed by the Chief of Police;

        6. You are directed to undergo a fitness for duty evaluation. Report to the City nurse on Monday—March 28, 2011 at 10:30 a.m. to complete the necessary paperwork for the doctor's appointment. You are then directed to report to the office of Dr. Thomas Latour on March 31, 2011 at 12:00 PM for evaluation/examination. . .

In addition, while on administrative leave, you will not be allowed to:

**Perform any Off-duty employment and you will not take any police action or overt act, which could be construed as police action**. (Emphasis original)

You will not come to the Police Department unless summoned by the Chief of Police or Internal Affairs.

If summoned, you will enter through the front lobby entrance and wait there until escorted by the watch Commander or his designee.

**<u>You will have no contact via person, phone, email or any other method of correspondence with any department personnel.</u>** (Emphasis added)

    **Violation of any criteria listed in this memo will be considered a Major Offense under PPM 261-1, Conditions of employment, which states:**

    **Major offenses are those <u>willful or deliberate violations that exceed those considered correctable by progressive, corrective disciplinary action</u> and which may result in immediate discharge without consideration of employment history or past performance. Major offenses include paragraph d., which states:**

    **Gross insubordination, consisting of a repeated refusal or failure to comply with a lawful directive given by a supervisor or superior after having been warned of the potential consequences of such actions**

72

**(Section 1.18, 2.4. and 2.9 of this PPM).** (Emphasis original)

LPD made two phone calls to Hewitt while he was on administrative leave which he did not return, and, despite its own instruction to him forbidding such contact, sought to discipline him for such failure to follow the normal rules. There was no message left for Hewitt concerning these calls and no way he could know that the calls came from Internal Affairs investigators. He testified that the number was not a number he recognized. This resulted in a one-day delay in LPD making contact with Hewitt. **Putting Hewitt in such a catch 22 position is capricious, i.e. it is not reasonable or rational.** Likewise, despite this prohibition on contact by any means LPD's investigation, identified as AD2011-011, was based on Hewitt's alleged failure to send in a change of address form. The evidence shows Hewitt was placed on administrative leave on March 25, 2011. At that time he was living at UPA Apartments and in fact, that is where the officers who drove him home brought him to. He did not move in to the Acadian Gardens apartment until April 5, 2011. He was prohibited by the written order placing him on administrative leave from "any correspondence" with the department. Further, Hewitt testified that when he was summoned to LPD headquarters later in April of 2011, he requested a change form.

Third, when LPD presented evidence of Hewitt's alleged "untruthfulness" regarding Hewitt's responses to Rostow's questions it was not forthcoming with all of the information in its possession. As discussed previously, LPD asserts that Hewitt was untruthful in responding to Rostow about how his superiors and fellow workers perceived him. As I have already stated, Hewitt's responses do not constitute a violation of the rules regarding truthfulness. The evidence of Hewitt's allegedly untruthful responses was obtained by LPD sending an employee to north

73

Louisiana to look into Hewitt's law enforcement employment history. LPD's agent obtained information from Hewitt's previous employers in that area of the state which information is in this record. Upon reviewing this information it is readily apparent that LPD focused only on the few negative comments made by any of his former employers and **ignored the overwhelmingly positive assessments** of Hewitt by these employers in order to fashion this information into a strained basis to allege that Hewitt was "untruthful" when he told Rostow he had a good reputation among his fellow officers and supervisors. **This was not rational behavior**. It is indicative of LPD's capriciousness. Moreover, the evidence shows that Hewitt's assessment of his professional reputation among his peers and supervisors *was not dishonest*. Even the majority admits as much. A reading of the entire report on the information gathered in north Louisiana reveals Hewitt did in fact enjoy a very fine reputation among his peers and he is especially lauded by his former supervisors as I have painstakingly chronicled in this dissent. Additionally, even his superiors at LPD, including Chief Craft and several other superiors, repeatedly referred to him as a "model police officer" and a "valuable asset to the LPD and the community." **It is capricious, irrational behavior at the very least for LPD to make an allegation of "untruthfulness," a serious level three infraction, based on whimsically picking and choosing information and ignoring the clear assessments by prior and current supervisors which clearly demonstrate that Hewitt's assessment of his own reputation was anything but false.** Further, I note too, that it is unclear from Rostow's query whether he was referring only to Hewitt's present employment or whether he meant to include all of Hewitt's past employment as well. Such ambiguity cannot form a basis to accuse Hewitt of being deliberately untruthful in his responses.

Further examples of LPD's capriciousness are its accusations that Hewitt "worked off-duty security while on paid administrative leave" and "committed gross insubordination by violating the conditions of paid administrative leave." The factual basis for these alleged infractions involve Hewitt's living arrangement at an apartment complex. Under the LPD rules officers are allowed to accept rent reduction or free rent in exchange for residing at an apartment complex as what is called a "courtesy officer," which is sometimes accomplished merely by parking the officer's patrol unit at the complex. In Hewitt's case he was given free rent in exchange for his mere presence at the complex as a courtesy officer. According to Hewitt's uncontradicted testimony the only thing he ever did during this time period at the apartment complex was on one single occasion when he told the apartment manager to call 911 and then asked a few kids to get out of the swimming pool until police arrived. He explained he did nothing more than any responsible adult would have done under the circumstances and informed the manager he could not take any action as an off-duty officer and that is the reason he instructed the manager to call 911. It is this incident which forms the basis of the alleged infraction. The written instruction to Hewitt was that he could not "Perform any off-duty employment" and he was not to "take any police action or overt act, which could be construed as police action." Hewitt believed the rules did not prohibit his acceptance of free rent during administrative leave as he did not understand this to constitute "performing" employment or engaging in any police action "or overt act which could be construed as police action." He specifically refused to engage in any such activity at the apartment complex as evidenced by his remarks to the manager and his instructing the manager to call 911. Additionally, off-duty officers are required to wear their police uniform when engaging in any off-duty employment, such as Hewitt's off-duty employment at

75

Dillards. He did not equate living rent free in exchange for his mere un-uniformed presence as engaging in any police action or activity. When he was informed that LPD considered this too was prohibited, he promptly reimbursed the rent. The language of the rule is not clear as to whether the acceptance of free rent as a "courtesy officer" while on administrative leave would be improper. This was the first instance of such an infraction, an offense defined in the rules as a minor, Category One offense. Under LPD's rules for such a first offense the prescribed disciplinary action is a "conference letter of counseling or letter of reprimand." Even a third offense within a five-year period results only in "A letter of reprimand or five-day suspension." But Hewitt received no progressive discipline as required by the LPD rules; instead, these facts were used as a stated cause for termination that LPD argues is made more serious by the express order in the Administrative Leave directive. It is not readily apparent that acceptance of free rent runs afoul of the order not to engage in police action, and given the ambiguity of this, Hewitt's acceptance of rent does not equate to a "willful or deliberate" violation of the rules as referenced in PPM 261-2, recited in the memo. Neither does his telling the manager to call 911, or asking kids to get out of the pool until police arrived, amount to overt police action. Hewitt was not in uniform, he did not identify himself to the juveniles as a police officer; and as he says, did no more than what any responsible adult would do. His instruction to the manager to call 911, which he did, was the appropriate thing for Hewitt to do and demonstrates his intention to adhere to the directives in the memo.

The same is true as to the allegations surrounding the infraction based on "personal documents" and objectionable images found on Hewitt's LPD computer. The record shows Steve Bergeron (Bergeron) conducted a search for LPD of Hewitt's LPD Laptop computer and he reported that: "[He] completed a search of

Officer Hewitt's LCG email account inclusive of his inbox, deleted items, personal folders and sent items whereby no personal emails were observed." This would indicate that Hewitt was not routinely using his laptop at work for personal use. Bergeron further reported:

> He did find items located on Hewitt's home drive which included a selfie photo of a nude female with tattooed wings on her shoulder blades; an (sic) web article "AK47 Full Auto Conversion of Dummies" by Royi Eltink, a 21 year old computer programmer; what appeared to be an on-line information service querry on April Elizabeth Labbe; a document regarding a Bay Self Serve Carwash Bank Short Sale ; on-line order for a book; word document Letter to Denzel Washington; and two saved Louisiana Criminal History searches for Sharon Green and Jeffery Singleton.

It is these five "documents" which form the basis of one of the twelve infractions relied upon to terminate Hewitt's employment. The evidence shows that two of these documents were actually background checks on suspects conducted by Hewitt. The document regarding Ak-47 firearms was shown to be connected to weapons training. Another document was identified as a draft of a letter addressed to the actor Denzel Washington which Hewitt explained in his uncontradicted testimony as something he drafted during a class conducted by the LPD instructing officers on better writing. Only one "document" had nothing to do with Hewitt's employment duties. According to Hewitt's uncontradicted testimony this "document" was a photo sent by email to Hewitt from a personal female friend as a joke. The document is a photo of the person's new tattoo and depicts her bare backside showing the tattoo across her back. Hewitt admits he opened the email not knowing what it contained and did not realize it was saved to the home drive. While this is technically inappropriate personal use of his LPD computer it is not worthy of termination according to LPD's rules. Under LPD's rules this is defined as a level one, minor offense, which the rule instructs merits

minor disciplinary action and oral instruction admonishing the employee that this constitutes inappropriate use of his assigned computer.

LPD also made much of eleven misdemeanor summons and written statements allegedly found in Hewitt's police unit dating back to 2008. As I have recounted above, and the majority acknowledges, when Hewitt was placed on administrative leave he was not allowed to return to his police unit. It was kept at headquarters and apparently no one from LPD made any effort to examine the unit for several months. After having the unit in its possession for quite some time LPD claims it found the summonses and witness statements in Hewitt's unit. Hewitt explained that these documents were copies of items already submitted as it was his habit to keep such duplicates for his reference. Others he explained as documents which should not have been initially issued as he concluded upon investigating the matters that there was no evidence any crime had been committed. He was not required to turn in such documents. Moreover, Hewitt testified without contradiction that his sergeant would always check his unit on a regular basis before he was placed on leave and he mentioned nothing about finding such documents or tickets in the unit which should have been turned in. He also testified without contradiction that LPD routinely sent email notifications concerning missing documentation but none had previously been sent to him. In the course of nearly six years working for the LPD Hewitt testified he wrote over four thousand misdemeanor summons, which are similar to a ticket, in addition to the numerous traffic tickets he wrote. Moreover, Hewitt and Sergeant Soileau testified that if any notification had been sent to Hewitt he would take care of any such problem. Once again, while this infraction is made to appear to present a serious infraction the evidence shows something much less. The evidence of this

alleged infraction does not preponderate in favor of cause for termination under LPD's own disciplinary procedures, even when viewed at the top of the heap.

Another of the alleged infractions relates to the allegation that Hewitt failed to turn in an updated request form for off-duty work at Dillards. It is undisputed that Hewitt had always turned in such forms in the past when provided the form by the shift Sergeant. In fact Hewitt turned in a form in February of 2010 when he began work at Dillards but no updated form was found for July of 2010. Hewitt testified that if a form was given out by the shift commander he would always fill it out. That testimony was uncontradicted. Hewitt could not prove that he submitted an updated form as required in July 2010, and there was no testimony as to whether the shift commander passed out such forms in July for officers to file. While it was incumbent on Hewitt to file the update in July his failure must be viewed in light of normal procedures. Again, this is a first-time infraction of a minor offense worthy of minimal disciplinary action according to LPD's rules and is mitigated by the fact that Hewitt had filed a form initially as required and was accustomed to receiving a renewal form during shift meetings. I repeat here, too, that **on July 30, 2010, Hewitt was described by Chief Craft in a written commendation as "an asset to [the] department and his squad, as well as the community."** Such a contemporary commendation contradicts the notion that Hewitt's failure in July 2010 to file a renewal notice of his continuing off-duty employment with Dillards should result in termination of his employment. It speaks volumes as to what is really afoot.

When Chief Craft testified at the hearing before the Board concerning his termination of Hewitt he testified he based his decision to terminate Hewitt's employment "based on the number of complaints and the fact that this would be his third time to receive discipline. . ." The majority finds this assertion

79

compelling. None of the twelve alleged infractions are a repeat of the three matters for which he was earlier disciplined. Chief Craft's testimony demonstrates there was no progressive discipline regarding any of the twelve alleged infractions, though Chief Craft, and the majority, acknowledge that such is in fact the policy of LPD. The attorney representing LPD asked Chief Craft if the termination was done in good faith and he responded "Yes" and "And was it done for cause?" to which he responded "Yes." But the determination of good faith and cause does not rest upon Chief Craft's assessment of LPD's actions.

Finally, in both its brief to this court, as it did before the Board, LPD makes much effort to paint Hewitt as a mentally unstable, dishonest, angry person of dubious character. LPD writes in its brief to this court: "Hewitt owed a duty to his superiors at the LPD, to the general public, and to the Lafayette City-Parish Consolidated Government to embody trustworthiness and high ethical character. His actions, however, demonstrate the antithesis of such values. Hewitt deserved termination." But my review of the record does not support this characterization which **is at odds with Dr. Latour's professional opinion after his analysis of Hewitt. It is at odds with Rostow's opinion of Hewitt. It is at odds with his previous law enforcement superiors in all of his jobs prior to joining the LPD. And, it is at odds with LPD's, including Chief Craft's, multiple documented characterizations of Hewitt as a model officer and asset to the force in the years preceding his public comments accusing the LPD of a "code of silence" and retaliation. LPD did not act in good faith in terminating Hewitt because it acted "arbitrarily, capriciously, [and] as the result of prejudice or political expediency,"** *Moore***, 839 So.2d at 945-46**, i.e. I am satisfied the record in this case manifestly supports finding that LPD created a false picture of Hewitt and

80

heaped a pile of individually low-level accusations upon him to bury what he and fifteen other brave souls sought to expose.

For the reasons stated I believe the Board acted arbitrarily and capriciously in upholding LPD's termination of Hewitt and I respectfully dissent from the majority's holding to the contrary.